UNITED STATES of America,

v.

Bess MEYERSON, Carl A. Capasso, a/k/a "Andy Capasso", and Hortense W. Gabel, Defendants.

87 Cr. 796 (KTD).

United States District Court, S.D. New York.

Jan. 14, 1988.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for U.S.; David N. Lawrence, Robert B. Bucknam, Jonathan Liebman, Asst. U.S. Attys., of counsel.

Goldman & Hafetz, New York City, for Bess Meyerson; Frederick P. Hafetz, Jeremy Gutman, of counsel.

Jay Goldberg, New York City, for Carl A. Capasso; Judd Burstein, of counsel.

Shea & Gould, New York City, for Hortense W. Gabel; Michael S. Feldberg, Steven N. Gersten (Admission pending), of counsel.

MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge.

The government moves to disqualify me from sitting on this case or, in the alternative, to have me make a "complete record" concerning the possibility of disqualifying me from this case. For the reasons that follow, the motion is denied. However, for reasons not suggested by the government, I choose voluntarily to recuse myself from this case.

*Facts*

Because of the peculiar circumstances surrounding the origins of this motion, and their effect on its substance, it is necessary to describe how this motion originated.

I initiated the discussion concerning recusal at the first pretrial conference I held in this case on October 23, 1987. My reasons for doing so are set forth in the discussion that follows. During that pretrial conference, at a sidebar on an unrelated matter, I made clear to all counsel the only contact that I have had with the defendants in this case: I had met Hortense Gabel on two occasions many years past. I detailed the circumstances of those brief meetings to assure all counsel that the meetings were not sufficient for recusal. My first meeting with Gabel occurred at a Brooklyn Law School moot court competition, which we both judged. The second meeting was an approximately two-minute exchange of pleasantries that took place as we passed each other at a restaurant. These two brief encounters make clear that I have no "relationship" with the defendant Gabel; rather, I have spoken with her twice. At

the end of the conference, the government requested that it be allowed to keep the issue of recusal under consideration. I granted that request.

The government first took a position on the issue of recusal in a letter to me dated October 26, 1987 from the Assistant United States Attorney handling the case. It stated that:

> Based upon a consideration of all of the factual circumstances now known to the Government, including your and your wife's relationship with those involved in this case, the Government respectfully requests that Your Honor permit a reassignment of this case to a judge who has "no relationship with the defendant[s]".

Letter from Assistant United States Attorney ("AUSA") David N. Lawrence (October 26, 1987). This is the first suggestion by the government that my wife was involved in this situation.

Because I did not know what this paragraph meant, I immediately had my law clerk call Lawrence and invite him to chambers to advise me regarding its meaning. Lawrence appeared that afternoon with Howard Wilson, the Chief of the Criminal Division of the United States Attorney's office. Wilson indicated that he, instead of Lawrence, would discuss the government's position in this matter with me.

As set forth by Wilson during this meeting in chambers, the government's request for reassignment of the case was based on four grounds. First, the government alleged that I am a close personal friend of defendant Hortense Gabel. I advised Wilson that I am not a personal friend of Gabel's. I described for him, as I had previously described on the record to Lawrence and defense counsel, the two occasions on which I had met and spoken with her.

Second, the government alleged that my wife, who is a state court judge, is a close personal friend of defendant Gabel, and that the two of them served together for some years in the uncontested divorce part of New York Supreme Court in Manhattan. I explained to Wilson that my wife is a Family Court Judge not empowered to rule on even uncontested divorces, that my wife had never been an Acting Supreme Court Justice, and that the only time I could remember her sitting in the Borough of Manhattan was in the Summons Part of Criminal Court which had nothing to do with uncontested divorces. All of these facts are included in the public records of this state. The allegation that my wife and defendant Gabel are close personal friends has not been mentioned since this meeting and has apparently been abandoned by the United States Attorney. In any event, my wife has told me that she recalls meeting Gabel perhaps once or twice at bar or judicial conferences. She reports that they greeted each other and had no conversations of any substance.

The last two grounds upon which the government rested its request that the case be reassigned involved Milton Gould. Gould is a name partner of Shea & Gould, the law firm representing defendant Gabel in this case. The government alleged that my wife had somehow obtained her position as a Family Court Judge through Gould. I explained to Wilson that my wife was appointed to her position by the Mayor of the City of New York. Gould, while on the Mayor's Judicial Screening Committee, recommended my wife for that position, based on his opinion of her performance as an attorney and adversary in a number of Securities and Exchange Commission cases. I further pointed out that my wife had done an admirable job and had subsequently been reconsidered and reappointed wholly independently of her original appointment; she was reappointed by a different Mayor and a different committee of which Gould was not a member.

Finally, the government alleged that I must recuse myself from this case because Gould and I have been longtime friends. Friendship, however, is no basis for disqualification. Gould did not appear before me as counsel in this case, nor will he be trying this case. Indeed, I let Wilson know that I had seen Gould at a charity affair where Gould told me that not he, but rather Michael Feldberg, would be trying this case.

At the October 26th meeting in my chambers, there was also some discussion about a conversation I had with another judge which is set forth in the discussion that follows. At the end of the meeting, Wilson stated that the government would continue its investigation into grounds for my disqualification. I responded that any such request by the government must be made by formal motion. I heard nothing more about this matter until immediately prior to the next pretrial conference scheduled in this case. Ten minutes before that conference was to begin, on December 21, 1987, a letter from the government was hand delivered to my chambers.

In the December 21st letter, the government asserted that my relationship with Gould required that I "put all of the relevant facts involved in this matter on the record." The letter alleged that I had not told Wilson on October 26th about meeting Gould at a charity affair and intimated that I was concealing something concerning that conversation from the government. The government further asserted that:

> To date, the Government has not received any communication from Mr. Gould that he has indeed disqualified himself from this case. Nor has the Government been told the reasons underlying the decision by Mr. Gould to recuse himself.

Letter from AUSA Lawrence (December 21, 1987). This passage implies that I told the government that they were entitled to a recusal and explanation from Gould. I did not. Indeed, I do not believe that any prosecutor has the right to such a document at any time.

Finally, the letter again made claims that an impermissible relationship existed between Gould and me. This time the allegation was that I had "at various times discussed joining the Shea & Gould firm." This allegation is addressed and refuted in the discussion that follows.

At the December 21st pretrial conference, on the record, I addressed the contents of the letter I received that day and set forth for defense counsel my actual discussion with the government in chambers on October 26th. I reiterated my conversation with Gould at the charity affair which I had fully described at the October 26th meeting.

At the close of the December 21st pretrial conference, I again made clear that any request by the government on the issue of my qualification to hear this case must be made by formal motion. I further instructed that any such motion must be supported by affidavits describing the exact facts and statements alleged, when and where they took place, and who said them. Such affidavits, rather than the rumor and innuendo that the government had relied upon until that point, are necessary for serious consideration of this motion.

The government submitted the instant motion on December 31, 1987. Contrary to my direction, their supporting affidavits only reiterate the rumors described previously, and do not include any specific facts. Nowhere has the government set forth any evidence contradicting any of my statements concerning my relationships with defendant Gabel or counsel in this case.

I again directed the government, on December 31, 1987, by phone, to file affidavits containing specific facts. Despite my repeated instructions, the government has steadfastly refused to do so. The government does not claim any privilege or advance any legal reason to justify this refusal. Rather, they assert that they have obtained the information contained in the affidavits from "respected members of the Court and legal community who have supplied information with the understanding that their identities would not be revealed in an affidavit." Letter from Hon. Rudolph W. Giuliani (January 4, 1988).

*Discussion*

The instant motion sets forth the grounds upon which the government now moves for:

1. The disclosure, by the Court, the parties herein, and their counsel, on-the-record, of all facts relevant to possible judicial disqualification; and

2. In the alternative, the disqualification of this Court, pursuant to 28 U.S.C. § 455(a), from presiding over the proceedings in the above-captioned case.

Government's Notice of Motion. Some of these grounds have not been raised until now. Each ground will be addressed separately.

The first new claim raised by the government is that I should disqualify myself because my "wife had been appointed to a judicial position once held by Justice Gabel...." Affidavit of Howard Wilson and David N. Lawrence, dated December 31, 1987, ("Wilson/Lawrence affidavit") at ¶ 9(iv). The fact of the matter is that my wife was appointed in March of 1977 to replace a retiring male Family Court Judge from the Bronx. Judge Gabel never served in the Family Court nor did she ever sit in the Bronx. Judge Gabel was elected a Civil Court Judge and served in that court from 1971 until she was elected a Supreme Court Justice in 1975.

The government next puts forth yet another distorted version of the events at the initial pretrial conference in this case. The government asserts that at that conference, my "in-court offer of recusal was made to defense counsel only and not to the government." Wilson/Lawrence affidavit at ¶¶ 12(ii) and 17(iii). The fact is that when I raised the issue of recusal, I gave counsel for each side an opportunity to take a position on the record. Transcript of proceedings dated October 23, 1987, at 10–11.

Another claim newly raised by the government is its demand that I explain an alleged statement to fellow judges that I would have to recuse myself in this case if it were assigned to me because I "have known 'Horty' for twenty years." Wilson/Lawrence affidavit at ¶ 23. I never made such a statement. I have only met her twice; I have repeatedly indicated to the government the extent of my acquaintance with the defendant Gabel. Twenty years ago I did not even know who she was. The government demands explanation of an assertion that they know is untrue.

I did make a comment in jest to one, or possibly two, other judges at the Second Circuit Judicial Conference. I stated that if I were assigned the case, I would like to recuse myself but that the only basis I could think of was sympathy for Judge Gabel, who had been required to sit in the uncontested divorce part for a long time. This was said in a jocular manner and no one overhearing it could have reasonably understood it to be otherwise.

The government next claims that I should recuse myself because of any discussions I might have had with the firm of Shea & Gould regarding possible association there. In support of this claim, the government submits the affidavit of Dennison Young, Jr., the Deputy United States Attorney, who states that he interviewed Milton Gould on at least two dates (December 23 and 24, 1987) concerning this matter and the other claims made by the government. Young's summary of what Gould told him concerning the government's allegation of discussions about employment entirely refutes the government's claim:

> [S]everal years ago, after a colleague of Your Honor's left the bench for private employment, Mr. Gould and Your Honor talked generally about Your Honor's thoughts about leaving the bench and entering private practice at some time. Mr. Gould stated that while there may have been general mention of Shea & Gould, Your Honor did not solicit employment, no offers were made, and the conversations were not unlike similar and very general conversations Mr. Gould has had with other judges. Mr. Gould characterized his conversations with Your Honor as having no material importance. He further stated that the conversations did not rise to the level of serious discussions.

Affidavit of Dennison Young, Jr., dated December 31, 1987, at ¶ 3(ii). Gould's explanation indicates that these general conversations were neither serious nor important, nor do they in any way support my disqualification from this case.[1]

On the basis of the above-described claims, the government demands an eviden-

---

**1.** So many judges have left the federal bench to practice law in the New York metropolitan area over the past 15 years that I doubt that there are many judges in this Circuit who have not dis- cussed, with some member of the bar, the "market" for former federal judges to return to practice.

tiary hearing into my disqualification from this case.

I now turn to the government's final demand for explanation. The government demands to know why, *sua sponte*, I offered to recuse myself at the request of any of the parties at the initial pretrial conference. I give an explanation not because I feel any necessity to do so, but rather because I believe that a greater insight into the reasons underlying the government's motion is necessary to clarify this entire matter. Two events led me to make the initial offer of recusal.

The first occurred on the day before the initial pretrial conference in this case. On that day, I was visited by a senior judge from this district. That judge told me that Mr. Giuliani had asked him to suggest to me that I recuse myself from this case because of my relationship with defendant Gabel. I advised that judge of the facts of this matter, and his opinion was that no basis for recusal existed.

The second event leading to my offer of recusal arose during the trial of *United States v. Castellano*, 84 Cr. 0063 (KTD). During that trial, defendant Castellano was gunned down in the street. News of his murder was flashed across television screens during Monday Night Football. The murder and the trial were headline news. The jurors all became aware of it. Yet at the outset of the *Castellano* case, I had warned both sides not to hold one-sided press conferences about the case—exactly the same order that I made in the case at bar. After Castellano's death, the Assistant United States Attorney trying the case came to me with an urgent request from the United States Attorney that he (the United States Attorney) be released from the publicity prohibition, so that he could comment publicly on the murder. I refused the request, telling the AUSA that even if I agreed with the United States Attorney, granting his request would create potentially reversible error. Allowing such publicity would most certainly decrease the remaining defendants' chances

for receiving a fair trial. The exact same request and denial were repeated on each of the following two days. After the third request, I stated to the AUSA that in the event that another high-publicity case was assigned to me, the government would face the choice of either the same rule regarding publicity, or making a motion to disqualify me. In the instant case it is interesting to note that the government was content to have me preside, even after I offered to recuse myself, until I announced that the court rule prohibiting one-sided publicity would be enforced and the same sanctions as applied in *Castellano* would be meted out for any violation in this case. Transcript of proceedings dated October 23, 1987, at pp. 11, 17.

The United States Attorney's motion for my disqualification apparently arises out of my long-established and oft-stated belief that cases should be tried in the courtroom and not in the newspapers. A recent example is a discussion forum held on June 25, 1987 at the Association of the Bar of the City of New York of which I was a panelist. The forum was entitled "Publicity and the Fair Trial Rule" and the panelists included two members of the press, a United States Attorney from another district, members of the defense bar, and myself. The discussion soon turned to intentional leaks of information either produced in the supposed secrecy of the grand jury, or concerning what action the grand jury was considering or planning to take. These leaks occurred primarily within the Southern District of New York. Indeed, one of the panelists produced a clipping from a newspaper of that week about what was occurring in the grand jury investigating a certain matter. The article made clear that the source of the writer's information must have possessed intimate knowledge of the proceedings before that particular grand jury.

During the panel discussion, I was asked whether I believed a hearing would be appropriate in that case to determine whether the prosecutor had deliberately violated Rule 6(e)(2) [2] of the Federal Rules of Crimi-

---

**2.** Fed.R.Crim.P. 6(e)(2) provides that:

A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist

who transcribes recorded testimony, an attorney for the government, or any person to whom disclosure is made under paragraph

nal Procedure in an attempt to prejudice the potential pool of jurors, and thus deprive the defendant of the right to a fair trial. I was further asked whether such misfeasance by the prosecutor should draw a sanction from the court, and what that sanction should be. In response, I stated that a motion by the defense in such a situation was appropriate and that some sanction should be imposed. All present agreed that if a prosecutor was leaking information from the grand jury, he or she would be guilty of a breach of Fed.R.Crim. P. 6(e)(2) and a violation of 18 U.S.C. § 401 (1982).[3] I also stated, however, that I did not believe that dismissal of the indictment was appropriate; no violation of a constitutional right was involved and relief could be obtained by transferring venue of the case to some district where there had been no publicity. I further suggested that public censure of the prosecutor could be one of the options available in that situation.[4]

Upon my return to chambers the next day, I sent a note to the Chief Judge of the Southern District advising him of the incident and the clipping of which I had become aware at the forum. I also suggested various alternative actions available to him. Since that time, I have had occasion to sent two other, similar notes to the Chief Judge.

Although my participation in the Bar Association panel took place months before the instant indictment was returned, the problem addressed at the panel discussion is relevant to this case. The instant indict-

ment was returned by the grand jury on October 7, 1987. Some months prior to the return of the indictment, a story appeared in the newspapers and on the various broadcast media which indicated that one of the defendants in this case had asserted her rights under the Fifth Amendment to the Constitution before the grand jury. Specifically, on January 9, 1987, NBC News reported that defendant Meyerson, according to unnamed sources, had "taken the Fifth" and asserted her constitutional right to refuse to testify before the grand jury.

The defendants in this case have filed a motion for sanctions against the prosecutor suggesting that the government is responsible for the leak of grand jury information. Defendants' motion was filed prior to the instant motion to disqualify. The defendants have also pointed to other stories, carried by the press long prior to the return of the instant indictment, which detail the proceedings before the grand jury. At least at first blush, it appears that these leaks can be attributed only to the government. The defendants request a full hearing in connection with these dated press clippings and media reports.

I have not yet ruled on the defendants' motion. I certainly do not know what the results of such a hearing would be. Indeed, only the government has knowledge of the facts to be brought out at such a hearing.[5]

---

(3)(A)(ii) of this subdivision [necessary government personnel] shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. ... A knowing violation of Rule 6 may be punished as a contempt of court.

**3.** That statute provides that:

A court of the United States shall have the power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

18 U.S.C. § 401 (1982).

**4.** Another option was discussed at the Bar Association forum. The United States Attorney for the Eastern District of New York disclosed that he had once discovered what appeared to be a grand jury leak and had *immediately* summoned the Attorney General's Office of Professional Responsibility to investigate the matter. He reported that there has been no recurrence of the problem in the Eastern District.

**5.** I have reviewed the government's response to the defendants' motion. The arguments advanced do not persuade me that a hearing would be inappropriate. Indeed, one of the arguments apparently concedes that there was a violation of Rule 6(e)(2) by unauthorized disclosure of information to persons employed by New York City.

Procedurally, if such a hearing is to be held, it can occur either before or after the trial. If held before the trial, then all of the relevant information and evidence are within the sole control of the government. The government would have the choice of bearing the burden of proof at such a hearing or of permitting the defense to review all of the government's files in the case prior to such a hearing. Under the Rules of Professional Conduct,[6] the present United States Attorney and all of the members of his staff would be disqualified from representing the government at such a hearing. If the hearing were to be delayed until after the trial, then the disqualification would also apply to the trial.

I am sure that the government was aware of my publicly stated opinions and their ramifications when it made the instant motion to disqualify me. I am convinced, however, that there is absolutely no valid basis set forth anywhere in the government's motion for me to disqualify myself in this case.

In response to the government's motion, defendants have argued that full disclosure of all the relevant facts has already been made, and that the facts demonstrate that there is no ground for a motion to disqualify. Defendants take the position that, in a case "where there are serious challenges to the legal sufficiency of the indictment, as well as serious allegations of prosecutorial misconduct ... the prosecutors' application is an assault on the integrity of this Court and on the entire assignment system in this district, and represents an attempt by a litigant to intimidate a District Court Judge." Letter from Michael S. Feldberg (January 5, 1988). I do not feel it necessary to comment on the defendants' arguments.

However, I am going to recuse myself from this case. The people of the United States and the defendants are entitled to as fair a trial as any judge in the district can give them. I resent the unsupported assertions of the United States Attorney and his tactics in attempting to disqualify me. They apparently arise from a belief that my understanding of the law and the proper conduct of an attorney for the government would hamper the way he wants to prosecute this case. I doubt that I can any longer maintain that impartiality and the appearance of impartiality which are necessary to the proper administration of justice. I am pleased that in this district I can thus indulge myself, because there are so many other judges who are eminently qualified to rule upon the motions and preside at any trial of this case.

This case is to be referred to the Assignment Committee of this court for reassignment to another judge pursuant to the rules of this court.

This motion and the events surrounding it are referred to the Grievance Committee of this court for such proceedings as they may deem appropriate.

SO ORDERED.

---

6. *See, e.g.,* DR 5–102. Withdrawal as Counsel When the Lawyer Becomes a Witness.

(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101 (B)(1) through (4).

(B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.

Code of Professional Responsibility, DR 5–102.