UNITED STATES of America, Plaintiff,

v.

Leo EISENBERG, Richard Cannistraro and Richard Bertoli, Defendants.

Crim. No. 89–218.

United States District Court, D. New Jersey.

March 22, 1990.

Robert P. Warren and John M. Fietkiewicz, Asst. U.S. Attys., and David M. Rosenfield, Special Asst. U.S. Atty., Office of U.S. Atty., Newark, N.J., for Government.

Barry M. Fallick, Rochman, Platzer, Fallick & Rosmarin, New York City, for defendant Leo M. Eisenberg.

Richard S. Cannistraro, New York City, pro se.

Michael B. Pollack, New York City, for defendant Richard Cannistraro, on these motions.

Patricia Codey, Asst. Fed. Public Defender, Newark, N.J., Stand-by counsel to defendant Richard S. Cannistraro.

Franklin M. Sachs, Podvey, Sachs, Meanor and Catenacci, Newark, N.J., for defendant Richard Bertoli.

## OPINION

LECHNER, District Judge.

Defendant Richard O. Bertoli ("Bertoli") filed this motion pursuant to 28 U.S.C. § 455(a) ("section 455(a)") and Rule 32 of the Federal Rules of Criminal Procedure ("Rule 32") for recusal because he asserts there may be a question of my impartiality as a result of comments *he* previously made about me and because I may have received data about Bertoli while presiding over a prior case, *United States v. Cannistraro*, Crim. No. 87–193 (the "First Cannistraro Indictment"), involving co-defendant Richard S. Cannistraro ("Cannistraro"). Succinctly stated, Bertoli reacted to the

sentence imposed in the First Cannistraro Indictment, a matter in which he was neither a party nor in any way involved, by forwarding to me a letter which a reasonable person would describe as unprovoked and nasty. Bertoli contends he mailed a letter of similar content to an Associate Justice of the Supreme Court with copies to other prominent people and several bar associations.

Cannistraro also filed a motion for my recusal pursuant to section 455(a). Cannistraro contends I may have become aware of certain data concerning the instant indictment (the "Superceding Indictment"), at the plea, detention and/or sentencing hearings during the First Cannistraro Indictment.

Oral argument was held on 29 January 1990. For the reasons which follow, these motions are denied.[1]

*Procedural History*

Although the Superceding Indictment concerns three defendants and only six counts, the threshold procedural motions and supporting filings to date fill almost three feet of shelf space. Briefly stated, the following is an overview of what has transpired and what brings the court to these motions concerning recusal.

On 2 November 1989 counsel for Bertoli filed a motion for my recusal (the "Bertoli Recusal Motion").[2] The Government filed its opposition to the Bertoli Recusal Motion on 17 November 1989.[3] On 22 November 1989 Bertoli filed a Reply Brief in support of the recusal motion (the "Bertoli Reply Brief"). Tracing the path of Bertoli, on 27 November 1989 Cannistraro filed, pro se, a motion, dated 24 November 1989, for my recusal (the "Cannistraro Recusal Motion").[4] The Government filed its opposition to the Cannistraro Recusal Motion on 5 December 1989.[5] On 11 December 1989 Cannistraro submitted additional support for his recusal motion.[6]

On 14 December 1989 Bertoli filed a motion for discovery to obtain information in connection with his motion for recusal (the "Bertoli Recusal Discovery Motion"). The listing of categories of documents and data sought in the Bertoli Recusal Discovery Motion is extensive and is keyed to the Exhibits attached to the Goverment Opposition to Bertoli.[7] However, in large part

1. This opinion is regreatably too long. However, it is necessary to address most, if not all, of the contentions—factual or legal—to pierce through the fog of battle in order to view the level battlefield itself.

2. Prior to filing the Bertoli Recusal Motion, Bertoli himself forwarded a letter with attachments to chambers demanding my recusal (the "Bertoli Recusal Letter"). Thereafter, Bertoli, through his attorney Franklin M. Sachs, Esq. ("Sachs"), filed on 2 November 1989 an Affidavit (the "2 November 1989 Sachs Aff.") and a brief and exhibits in support of the Bertoli Recusal Motion. On 3 November 1989 Bertoli filed a letter brief in further support of the Bertoli Recusal Motion (the "3 November 1989 Bertoli Letter Brief") and attached a copy of the transcript of the Sentencing Hearing on 2 November 1987 concerning the First Cannistraro Indictment. On 8 November 1989 Bertoli filed an Amended Brief and exhibits in support of the Bertoli Recusal Motion, dated 6 November 1989 (the "Bertoli Amended Brief"). On 8 November 1989 Bertoli filed a "short amendment" to his papers filed in support of the Bertoli Recusal Motion (the "Bertoli Short Amendment").

3. The Government opposition papers include a Memorandum of Law in Opposition (the "Government Opposition to Bertoli") and Exhib-

its 1 through 16 which purportedly formed the basis for additional motions by Bertoli and Cannistraro. *See, e.g.,* footnotes 7 and 8, *infra,* and accompanying text.

4. In support of his recusal motion, Cannistraro filed a brief (the "Cannistraro Brief") on 27 November 1989. Cannistraro also "relies upon the motion and supporting documents submitted on behalf" of Bertoli in connection with the Bertoli Recusal Motion. Notice of Motion of Richard S. Cannistraro for an Order for the Recusal of Alfred J. Lechner, Jr. at 2.

5. The Government opposition papers include a Memorandum of Law in Opposition.

6. Although received on 11 December 1989, this submission from Cannistraro is a letter, dated 1 December 1989 and attached to the letter is a memorandum in support of recusal (the "Cannistraro Memorandum"). The Cannistraro Memorandum is a collection of excerpts from other briefs submitted in connection with the First Cannistraro Indictment.

7. The Bertoli Recusal Discovery Motion demands "disclosure of the following evidence [sic] by the Government prior to any hearing on the Bertoli Recusal Motion:

these Exhibits are either letters, affidavits or complaints drafted and filed by Bertoli himself. Again in trace of Bertoli, Cannistraro filed on 18 December 1989 a motion, dated 14 December 1989, for disclosure of information concerning his motion for recusal (the "Cannistraro Recusal Discovery Motion").[8] While the listing of the catego-

1. Any and all tape recordings or transcripts of telephone conversations involving defendant Bertoli from January 1, 1975 to date which are in the Government's possession.

2. Any and all tape recordings or other transcripts of telephone conversations involving defendant Richard S. Cannistraro from January 1, 1975 to date which are in the Government's possession. Defendant Cannistraro has given us his consent to seek such tapes and transcripts.

3. All files of any investigation by any governmental agency or office, including but not limited to the General Accounting Office, regarding the alleged use by Judges Stern and Lacey of the United States Marshalls Service for personal purposes.

4. All records and files relating to the alleged leak, or any investigation thereof by any governmental agency or office, of confidential information by Securities and Exchange Commission ("S.E.C.") employees to the press in January, 1976 regarding the grand jury investigation of defendant Bertoli and/or Executive Securities.

5. All records and files relating to any investigation conducted by any governmental agency or office, including but not limited to the S.E.C., of Harry L. Garmansky concerning the complaints made about Mr. Garmansky in *Bertoli v. Goldstein,* Civil Action No. 76–207.

6. All records and files possessed by any governmental agency or office, including the S.E.C. and the U.S. Attorneys Office, relating to investments in the name of Anna Graber.

7. All records and files relating to any investigation by any governmental agency or office of Jacob Graber concerning the complaints made against Mr. Graber in *Bertoli v. Foreman of Grand Jury,* Civil Action No. 76–286.

8. All records and files relating to the actions of the S.E.C. in investigating and auditing Executive Securities which are the subject of complaint in *Bertoli v. Goldstein,* Civil Action No. 76–207 and *Bertoli v. Foreman of Grand Jury,* Civil Action No. 76–286.

9. All records and files of the alleged leak, or any investigation thereof by any governmental agency or office, of false rumors by S.E.C. employees in 1975 regarding the alleged short position of Executive Securities with respect to IBM stock.

10. All records and files of any investigation conducted by any governmental agency or office, including but not limited to the S.E.C., relating to defendant Bertoli's allegation that in September, 1975 an affidavit containing false statements was sworn to by Peter Quigley and submitted by Harry L. Garman-

sky to the Administrative Law Judge in charge of the S.E.C. hearing on Executive Securities.

11. All records and files of any investigation conducted by any government agency or office relating to the alleged perjury committed by Stanley Hecht, a former S.E.C. counsel.

12. All records and files relating to any governmental negotiations, including but not limited to negotiations involving Assistant United States Attorney Robert P. Warren, with Herbert Cannon.

13. All records and files of any investigation conducted by any governmental agency or office, including but not limited to the S.E.C., relating to the alleged perjury committed by Stanley Skubina in a hearing involving defendant Bertoli."

*Id.* at 1–3.

Bertoli "reserve[d] his right, after receiving such discovery, to move before the Court for an evidentiary hearing on the issues raised by his recusal motion and for the right to subpoena witnesses as necessary for testimony at such hearing." *Id.* at 3–4. The entire Bertoli Recusal Discovery Motion was denied by Letter–Opinion and Order, dated 11 January 1990.

8. The Cannistraro Recusal Discovery Motion demands "disclosure of the following evidence [sic] by the Government prior to any hearing on defendant Cannistraro's Motion for Recusal:

1. Any and all tape recordings or transcripts of telephone conversations involving defendant Bertoli from January 1, 1975 to date which are in the Government's possession.

2. Any and all tape recordings or other transcripts of telephone conversations involving defendant Richard S. Cannistraro from January 1, 1975 to date which are in the Government's possession.

3. Any and all tape recordings or other transcripts of telephone conversations involving Carl Alan Key from January 1, 1975 to date which are in the government's [sic] possession.

4. All records and files in connection with the ex parte meetings of Goldsmith of the SEC with Judge Alfred [J.] Lechner[, Jr.] including but not limited to the ex parte meeting referred to in the letter of Goldstein dated February     , 1988 addressed to Judge Lechner.

5. All records and files in connection with the ex parte meeting of Robert S. Warren with Judge Alfred [J.] Lechner[, Jr].

6. All records and files of any investigation conducted by any governmental agency or office, including but not limited to the Government's allegation that defendant Richard S. Cannistraro has:

ries of requested documents is extensive, the documents, if they exist, are largely unrelated to the Cannistraro Recusal Motion. As well, on 18 December 1989, Cannistraro submitted his reply brief to the Government opposition to his motion for recusal.

As noted, the Bertoli and Cannistraro Recusal Discovery Motions were denied in their entirety on 11 January 1990 by Letter–Opinion and Order of that date (the "11 January 1990 Letter–Opinion").[9] The next day counsel for Bertoli filed yet another motion on short notice for an order striking all Exhibits from the Government's Opposition to Bertoli and for me to recuse myself on the Bertoli Recusal Motion and reassign the motion to another judge. In support of these two motions Bertoli submitted the affidavit of Sachs, dated 12 January 1990

> A. stated that "—I (Schlichter) was one of the five people that Mr. Cannistraro would like to see killed." Detention Hearing September 24, 1987 at page 46.
> B. "—invested in a company called Veco." Detention Hearing September 24, 1987 at page 91.
> C. stated to Bennet Syms that "—if you don't cooperate, he would wind up dead." Detention Hearing September 24, 1987 at page 103.
> D. stated to Bennet Syms that "—these people were organized crime people." Detention Hearing September 24, 1987 at page 104.
> E. stated to Carl Alan Key that "—he (Cannistraro) went down to the Caymen Islands with four people, one of them was Leo Eisenberg, and the other two were organized crime people." Detention Hearing September 24, 1987 at page 105."

*Id.* at 1–3. Cannistraro also made the same demand for an evidentiary hearing and to subpoena witnesses. The entire Cannistraro Recusal Discovery Motion was denied by Letter–Opinion and Order, filed 11 January 1990.

**9.** *See* notes 7 and 8, *supra.* Although Bertoli's statements and actions in the present litigation and his activities in past actions might support not only a charge of judge shopping but also such a conclusion by a reasonable person, a finding to that effect is not necessary to adjudicate the recusal motion. As will be discussed at length *infra,* the standard in a section 455(a) motion is whether a reasonable person knowing the facts might reasonably question a judge's impartiality. *United States v. Martorano,* 866 F.2d 62, 67 (3d Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1128, 107 L.Ed.2d 1034 (1990). Whether Bertoli is actually attempting to judge shop is not the issue in the case *sub judice.*

(the "12 January 1990 Sachs Aff.") and voluminous other documents. On 22 January 1990 the Government submitted a succinct letter in opposition to these motions.

During the course of the above-described motion practice, the Government filed on 6 November 1989 a motion in this case for leave to take foreign depositions and for the issuance of a request for foreign judicial assistance for discovery in the Caymen Islands together with supporting documentation (the "Government's Caymen Islands Discovery Motion"). On 14 November 1989 Sachs, counsel for Bertoli, suggested a delay of the decision on the Government's Caymen Islands Discovery Motion until after the Bertoli Recusal Motion was decided. 14 November 1989 Letter from Sachs (the "14 November 1989 Sachs Letter").

All that is needed to decide the issue is knowledge of the actions Bertoli took and the statements he made, the length of time between his accusations and the opening of this case, the negligible effect Bertoli's statements had on anyone to whom they were addressed and my decision not to respond his letters.

Bertoli, apparently upset with the sentencing in the First Cannistraro Indictment, sent some ill-considered letters to people who neither responded to nor took action on them. In matters before other judges he has done the same. He in no way claims the allegations in the letters are true. The incidents at issue are over two years old. Other than this opinion, I never responded to nor have I commented on Bertoli's conduct or his accusations.

These facts are in the record and are all that is necessary to decide this motion. Discovery as to whether Bertoli was actually judge shopping is unimportant. Such discovery would be burdensome, time consuming and unnecessary given the standards of section 455(a). The parties and the court would expend valuable resources on an issue that is only tangentially, if at all, related to the issue at hand. However, the circumstances here are not inconsistent with judge shopping and a district court should be aware of the possibility of creating undesirable precedents when that threat exists. *See United States v. Dalfonso,* 707 F.2d 757, 760–61 (3d Cir.1983).

The Cannistraro Recusal Discovery Motion is as meritless as is the Bertoli motion. The documents requested by Cannistraro, if they exist, are irrelevant. Cannistraro's request at items 4 and 5 of his motion, *see* note 8, *supra,* have been dealt with previously, *see* 11 January 1990 Letter–Opinion, and will be addressed briefly later in this Opinion. Succinctly stated, however, there were no *ex parte* communications concerning Cannistraro.

On 17 November 1989 Bertoli, through Sachs, filed his opposition to the Government's Caymen Islands Discovery Motion. On 22 November 1989 the Government filed its Reply. As described above, Bertoli then filed a series of additional motions which delayed argument on the Bertoli Recusal Motion.

While all of this was pending and after Sachs requested a delay of the decision concerning the Government's Caymen Island Discovery Motion, Bertoli applied for and obtained, on an *ex parte* basis from the Grand Court of the Caymen Islands, an injunction prohibiting the Government from applying to the courts of the Caymen Islands for the discovery described in the Government's Caymen Island Discovery Motion. This *ex parte* injunction was applied for on 11 December 1989 and obtained on 4 January 1990. Sachs delivered a copy of these papers to the Government on 9 January 1990.[10] Sachs, however, did not deliver a copy of these papers to the court when he delivered them to the Office of the United States Attorney.

I was unaware of the application for or issuance of this injunction until I received a copy of the documentation from Assistant United States Attorney John M. Fietkiewicz via letter, dated 11 January 1990 (the "Fietkiewicz Letter"), advising me an order had been obtained on behalf of Bertoli, Eisenberg and Cannistraro, on an *ex parte* basis, restraining Attorney General Thornburg, United States Attorney Alito, Assistant United States Attorney Warren and Special Assistant United States Attorney Rosenfield "from making any application to the Grand Court of the Caymen Islands

under the Evidence (Proceedings and other Jurisdictions) Order 1978, which denies the plaintiffs the right to challenge the application or any proceedings thereon in the Grand Court of the Caymen Islands." Fietkiewicz Letter. Shortly thereafter, I received a letter, dated 11 January 1990, from Sachs (the "11 January 1990 Sachs Letter") in response to the Fietkiewicz Letter. Sachs stated:

I wanted the Court to understand that the reason that I had not provided the Court with a copy of that injunction was simply because the Court had indicated that it was not going to deal with any other matters until it had ruled on the pending recusal Motion. I do not want it to appear to the Court that we were in any way seeking to hide from the Court the action which we felt was essential to take in the Caymen Islands. To the contrary, we simply felt it inappropriate to file any further papers with Your Honor pending ruling on the motion for recusal.

However, inasmuch as the Government has seen fit to informally provide Your Honor with the papers, I believe it is imperative to document the file by making them formally part of the record and I am therefore, this day, filing them with the Clerk's Office.

11 January 1990 Sachs Letter.

The comments in the above-quoted portion of the 11 January 1990 Sachs Letter are, to say the least, surprising. The concept of delaying decision on the Government Caymen Islands motion originated with Sachs. *See* 14 November 1989 Sachs Letter. With regard to Sachs' comments about "seeking to hide from the court the

---

**10.** On 9 January 1990 Sachs delivered to the office of the United States Attorney "in accordance with an order of the Grand Court of the Caymen Islands dated January 4, 1990 and filed January 8, 1990 [the following documents]:

(1) Writ of Summons dated December 11, 1989;

(2) Ex Parte Summons for Interlocutory Injunction dated December 11, 1989;

(3) Affidavit of Franklin Sachs dated December 11, 1989;

(4) Second Affidavit of Franklin M. Sachs dated December 11, 1989;

(5) Affidavit of Franklin M. Sachs dated December 20, 1989;

(6) Order of Grand Court of the Caymen Islands restraining and enjoining the defendants [Richard R. Thornburg, Attorney General of the United States, Samuel A. Alito, United States Attorney for the District of New Jersey, Robert Warren, Assistant United States Attorney and David Rosenfield, Special Assistant United States Attorney] dated January 4, 1990; and

(7) Affidavit of Alasdair MacDonald with exhibits dated January 5, 1990."

Sachs Letter to Samuel Alito, United States Attorney, dated 9 January 1990.

action which we felt was essential to take in the Caymen Islands," it is difficult to understand any other intent for his actions. This is especially so in light of the Government's Caymen Island Discovery Motion which was filed more than a month prior to the *ex parte* application by Sachs and to which Sachs not only filed opposition on behalf of Bertoli but, as mentioned, requested a delay in handling until the recusal motion had been decided.

It is likewise difficult to understand the meaning of the last sentence quoted from the 11 January 1990 Sachs Letter which stated that the "Government has seen fit to informally provide Your Honor with the papers" which Sachs filed and obtained on an *ex parte* basis. Because Sachs had decided not to provide the court with a copy of these papers, which appear to have some relevance to the Government's Caymen Islands Discovery Motion, it is difficult to understand how or when I would have been apprised of this turn of events but for the Government forwarding a copy to me.

The *ex parte* application and order are at best curious from a professional point of view. Indeed, the bona fides of the conduct of counsel in filing the Bertoli Recusal Motion, which are raised in the first instance by counsel to Bertoli in the 2 November 1989 Sachs Affidavit ¶ 5, in the Bertoli Reply Brief at 6,[11] and again at oral argument on 29 January 1990 (*see* Transcript of Oral Argument on 29 January 1990 (the "29 Jan.1990 Tr. at ——") at 11), are curious as well.[12]

As if the volume of Bertoli's submissions were not enough, his counsel submitted, just one business day before oral argument on the Bertoli motions, yet more paper. This time Bertoli submitted what his counsel contends were attachments to Bertoli's

letter to Justice Thurgood Marshall, dated 3 November 1987 (the "Marshall Letter"). The Marshall Letter is annexed as an Exhibit to the 2 November 1989 Sachs Affidavit, Exhibit B to the Bertoli Amended Brief and is mentioned within Exhibit A to the 12 January 1990 Sachs Affidavit. Why this additional paper—to which there are no less than three previous references in Bertoli submissions—is relevant or necessary is not explained.

An interesting fact which bears note is the absence of an affidavit or certification from either Bertoli or Cannistraro. The absence of such affidavit or certification is notable not only concerning their contention of impartiality but as well concerning even basic facts—such as the Marshall Letter, and the other conduct of Bertoli which is now before the court. There is nothing to establish the Marshall Letter and attachments, if any, were in fact posted, as alleged. Nor is there a denial of other conduct on the part of Bertoli, as has been unquestionably established by the Government.[13]

On 25 January 1990 Michael B. Pollack ("Pollack"), counsel for Cannistraro, filed a motion (the "Pollack Motion") on short notice which is duplicative of prior Cannistraro motions in that it requested an evidentiary hearing with regard to the recusal motion and for a reassignment of the Cannistraro Recusal Motion to another judge. This is the first appearance by Pollack on behalf of Cannistraro. Pollack argued the Cannistraro motions. The Pollack Motion makes certain allegations and characterizations which will be addressed later in this opinion.

*Facts as to Bertoli*

On 29 September 1989 a grand jury returned the Superceding Indictment, which

---

**11.** The 2 November 1989 Sachs Affidavit states: "The motion of defendant Bertoli for an Order of Recusal under 18 [28] U.S.C. [§] 455(a) is made in good faith." *Id.* at ¶ 5. This representations is gratutious and is not required pursuant to section 455. *Compare* 28 U.S.C. § 144. The Bertoli Reply Brief states: "Indeed, if counsel had believed that the defendant deliberately created the grounds upon which this recusal motion is based, the motion would not have been filed." *Id.* at ¶ 6.

**12.** This is neither the moment nor the method by which to determine the bona fides of the conduct of counsel to Bertoli as they raise the issue concerning the recusal motion or to other applications filed in this court or elsewhere.

**13.** See text at 1145–1147, *infra*, concerning Bertoli conduct as well as letter and affidavits submitted by Bertoli in other litigation commenced by him.

contains six counts, against Bertoli and co-defendants Cannistraro and Leo M. Eisenberg ("Eisenberg"). The Superceding Indictment charges the defendants with racketeering, conspiracy and obstruction of justice. The Superceding Indictment was unsealed on 5 October 1989. As previously noted, Bertoli thereafter wrote a letter to me requesting my recusal "without formal motion by [his] attorney." Bertoli Recusal Letter. This was followed by the Bertoli Recusal Motion.

The Bertoli Amended Brief in support of his motion contends that my "impartiality might reasonably be questioned as a result of the formal complaints [14] previously registered by Mr. Bertoli." Bertoli Amended Brief at 3. The 3 November 1989 Bertoli Letter Brief contends I presided over the First Cannistraro Indictment in which Bertoli contends (i) I read a presentence report concerning Cannistraro and (ii) I "heard non-evidentiary representations about the alleged criminal responsibility of other defendants," *id.* at 3, presumably including Bertoli.

The purported basis for recusal arises from Bertoli's reaction to the sentencing of Cannistraro on the First Cannistraro Indictment. In May of 1987 Cannistraro was indicted on charges of security fraud and obstruction of justice. It is contended Bertoli "assiduously followed the criminal proceedings against Cannistraro" in the First Cannistraro Indictment. Bertoli Amended Brief at 1. In that indictment Cannistraro pleaded guilty to all counts without a plea agreement and was sentenced on 2 November 1987 to eight years imprisonment (his

total exposure was fifty years). Bertoli contends he attended the Cannistraro sentencing.[15] Apparently, Bertoli thought "the sentence was incredibly harsh." 29 Jan. 1990 Tr. at 27. In addition, Bertoli claims he reviewed transcripts of the Cannistraro detention hearings held on 21 and 24 September 1987. Bertoli Amended Brief at 1.

On 2 November 1987 Bertoli wrote to chambers and expressed his displeasure with handing the First Cannistraro Indictment and called for my resignation. Bertoli Amended Brief, Exhibit A. The letter contained a warning that if I did not resign within thirty days, Bertoli would "refer this matter to the Judiciary Committee and bar association for action." *Id.*[16] In the Marshall Letter, dated 3 November 1987, Bertoli referred to me in unflattering terms, requested a review of the sentencing of Cannistraro on the First Cannistraro Indictment and demanded that I receive a reprimand and be impeached. Bertoli Amended Brief, Exhibit B. It is contended a copy of the Marshall Letter was forwarded to the Ethics Committees for the American Bar Association, the New Jersey Bar Association, Senator Edward Kennedy and then Congressman Peter Rodino. Bertoli Amended Brief at 2. I did not respond to the communications from Bertoli.[17]

The Government submitted a transcript and the actual audio tape of a telephone conversation between Cannistraro and Bertoli (Government Opposition to Bertoli at 6 and Exhibit 1) which occurred in December 1987 during Cannistraro's incarceration on the First Indictment.[18] This conversation

---

**14.** As mentioned below, the so-called "formal complaints" were merely letters written by Bertoli to Justice Thurgood Marshall with copies to Senator Edward Kennedy, then Congressman Peter Rodino, and to the Ethics Committee of the American and New Jersey Bar Associations.

**15.** Although Bertoli asserts he was present for the sentencing of Cannistraro, I was not aware of his presence, if in fact he was present. In fact, the first time I was aware of being in the same room with Bertoli was when he was arraigned on the Superceding Indictment on 6 November 1989.

**16.** The demand for resignation within a specified period of time appears to be the usual method of operation for Bertoli. He took the same tact concerning the removal of an Administrative Law Judge presiding over a hearing concerning Bertoli and a Bertoli company. *See* text at 1146, *infra.*

**17.** It appears all parties to whom this correspondence was forwarded have ignored Bertoli.

**18.** It appears all non-privileged prisoner communications made from or received at the prison were recorded. Prisoners were apprised of the practice.

concerned, among other things, the Marshall Letter. The conversation, together with the Bertoli Recusal Letter and the Marshall Letter, is revealing.

Bertoli and Cannistraro discussed the Marshall Letter in December 1987 and Bertoli expressed an interest in the effect of the letter on me:

> Bertoli: ... my letter complaint on Lechner is in the mail today.
>
> Cannistraro: Okay.
>
> Bertoli: Ahh ... the second the second paragraph I'll use (u/i). The second paragraph says Mr. [sic] Lechner has displayed a lack of judicial temperament and truly needs psychiatric help and analysis. He should love me for that.

Government Opposition to Bertoli at 6 and Exhibit A. The matter rested for two years without any further comment by Bertoli until he was named in the Superceding Indictment.

A reasonable person could reasonably conclude the comments exchanged between Bertoli and Cannistraro to which reference is made above are part of a plan by Bertoli to attempt to ensure I would not preside over any future criminal matter in which he was involved.[19] At least by the time of the First Cannistraro Indictment, it appears Bertoli was aware that he was a primary subject of a grand jury investigation which also concerned Eisenberg.[20]

It appears this is not the first occasion Bertoli, prior to being indicted, made unprovoked, exceptional allegations against federal judges with whom he had no prior dealing. From January 1976 through the Spring of 1977, a federal grand jury in New Jersey was investigating, among other matters, Bertoli's role in the collapse of his New York City brokerage firm, Executive Securities Corp. ("Executive Securities"). Bertoli was aware of the then pending grand jury investigation of Executive Securities, his status as a target of the investigation and the probability he would be a criminal defendant.

On 26 January 1976 Bertoli forwarded a letter to then United States Attorney Jonathan Goldstein. In this letter Bertoli referred to a grand jury conducting a criminal fraud investigation concerning Executive Securities as well as himself and advanced certain complaints and threatened legal action "against all individuals involved." Government Opposition to Berto-

---

**19.** The facts and circumstances giving rise to the Bertoli Recusal Motion appear to support a finding that Bertoli, since the time of the sentencing of Cannistraro on the First Cannistraro Indictment, had a calculated plan seeking to have me disqualified in the event Bertoli would be indicted in a case assigned to me. The Government has submitted evidence which suggests Bertoli has engaged in a similar course of conduct involving other judges and past proceedings. Bertoli has submitted nothing to contest his actual conduct or the filings he effected or the accuracy of the Government submissions concerning Federal Judges Frederick B. Lacey and Herbert Stern, Administrative Law Judge Ralph Tracy, U.S. Attorney Goldstein and a federal Grand Jury and its foreman. These facts appear to be beyond contest. However, a finding concerning why Bertoli did each of these things or his intent is not necessary.

Regardless of Bertoli's previous other conduct, as mentioned above, the Bertoli Recusal Motion must be denied because it is based exclusively upon Bertoli's own conduct. Bertoli has submitted no evidence of conduct, statements or even intimations by me which could possibly lead to a conclusion or even an inference that I had a preconceived opinion about Bertoli prior to the issuance of the Superseding Indictment. Also, the facts of this case do not require recusal as a matter of public perception.

Bertoli's intent in filing this motion is irrelevant. The Bertoli and Cannistraro Discovery Motions were denied on this ground. I decline any invitation to find Bertoli's conduct amounted to a calculated plan to force my recusal because such a finding is unnecessary. Even absent an intent to coerce my recusal, Bertoli has presented no evidence in support of his position that I should disqualify myself from this case.

**20.** In June of 1987 after the First Cannistraro Indictment, the Government filed a motion to stay discovery proceedings in a related civil case filed in the Southern District of New York, *S.E.C. v. Monarch Funding Corp., et al.,* Civil No. 85–7072 (LBS). In support of that motion, the Government submitted an affidavit of Michael J. Cahill, Special Agent of the FBI, sworn to 17 June 1987 ("Cahill Aff."). The affidavit stated that:

> The other civil defendants in this action, Monarch, its principal owner, *Leo Eisenberg, Richard Bertoli* and Steven Cloies, plus others, *are primary subjects of the criminal investigation.*

Government Opposition to Bertoli at Exhibit 2; Cahill Aff., ¶ 4 (emphasis added).

li, Exhibit 3. Shortly thereafter, in or about the first week of February 1976, Bertoli filed a verified complaint against United States Attorney Goldstein and his office (the "Goldstein Lawsuit"). Government Opposition to Bertoli, Exhibit 7, Verified Complaint.

Bertoli contended in the Goldstein Lawsuit that on or about 22 January 1976 United States Attorney Goldstein and his office developed a plan of harassment concerning Bertoli. *Id.*, Verified Complaint at ¶ 5. He also referred to the then pending Securities and Exchange Commission ("SEC") hearing concerning Executive Securities and referred to the SEC hearing as a " 'kangaroo court' administrative hearing." Bertoli also attacked the administrative law judge, the Honorable Ralph Tracy, to whom the matter had been assigned. *Id.*, Verified Complaint at ¶¶ 8–16. Bertoli, in the Goldstein Lawsuit, made specific reference to the SEC attorney handling the matter at the hearing. Bertoli quoted the SEC attorney as stating "that he was close to Judge Lacey, Judge Stern[21] and U.S. Attorney Goldstein and that he [the SEC attorney] would use them to 'get [Bertoli]' if [he] did not stop making a fool out of [the SEC attorney] during the [SEC] administrative hearing." *Id.*, Verified Complaint at ¶ 18.

In the Goldstein Lawsuit, Bertoli demanded that United States Attorney Goldstein and his office be enjoined from violating Bertoli's rights, that they be disqualified from taking part in the SEC investigation concerning him and Executive Securities and that the grand jury which was investigating both him and Executive Securities be discharged.

On 17 February 1976, on the heels of the Goldstein Lawsuit, Bertoli filed yet another verified complaint, this time against the foreman of the grand jury and the grand jury investigating Executive Securities (the "Grand Jury Lawsuit"). Government Opposition to Bertoli, Exhibit 8, Verified Complaint. In the Grand Jury Lawsuit Bertoli made far ranging allegations concerning the SEC hearing with regard to Executive

Securities and specifically alleged the SEC hearing was used as a cover-up to discredit him. *Id.*, Verified Complaint at ¶ 29. Bertoli also complained about the United States Attorney and his office and stated that the "Foreman [of the grand jury] must insist upon the disqualification of any prosecutor where there is any appearance of bias, prejudice or personal interest which could violate the due process rights of plaintiff." *Id.*, Verified Complaint at ¶ 59. Bertoli demanded the issuance of an injunction against the foreman of the grand jury and the grand jury as a whole to prevent them from violating his rights and various federal laws, rules and regulations. Bertoli also demanded the disqualification of the foreman and the grand jury as a whole and the discharge of the grand jury with regard to the investigation of Executive Securities and Bertoli.

On 23 April 1977 Bertoli wrote a letter to then United States Attorney General Griffin Bell, copying President Carter, other Government officials and the American and New Jersey Bar Associations. The letter "demand[ed] that United States District Court Judges Frederick Lacey and Lawrence [presumably Herbert] Stern be indicted." (the "Lacey/Stern Letter"). Government Opposition to Bertoli, Exhibit 4. Bertoli advanced accusations against Judges Lacey and Stern which were unrelated to Bertoli in any way.

Placed among the 26 January 1976 letter to United States Attorney Goldstein threatening legal action, the Goldstein Lawsuit, the Grand Jury Lawsuit and the Lacey/Stern Letter, Bertoli sought the recusal of a judge in the matter in which the SEC filed an administrative proceeding against him and another individual in connection with the demise of Executive Securities. The matter was assigned to Administrative Law Judge Ralph Tracy who presided over an evidentiary hearing.

Bertoli demanded Judge Tracy disqualify himself asserting that the "[g]rounds for said disqualification are based upon the bias and prejudice of said Judge." Govern-

---

**21.** Judges Lacey and Stern were members of the court sitting in the District of New Jersey at the time. Judges Lacey and Stern have since retired and resigned from the bench.

ment Opposition to Bertoli, Exhibit 5, Bertoli Affidavit, sworn to 7 April 1976, at ¶ 2. Bertoli stated: "In the event of your failure to respond with [sic] ten days, I will have no choice but to move in the United States District Court for your removal." Government Opposition to Bertoli, Exhibit 5; 7 April 1976 Letter to Judge Tracy (the "Tracy Removal Demand"). Apparently the motion was filed because Judge Tracy ruled against Bertoli on certain matters; the motion was denied.

Approximately two months after the Lacy/Stern Letter, Bertoli was indicted by a federal grand jury on seventy-seven counts relating to a securities fraud scheme. The indictment, however, was not assigned to either Judge Lacey or Judge Stern. The matter was assigned to another judge; Bertoli pled *nolo contendere* to all charges.

### Facts as to Cannistraro

Although some facts with regard to Cannistraro have previously been set forth in this opinion, it is necessary to set forth not only facts bearing on the claims of Cannistraro in this matter, but, as well, with regard to Cannistraro in connection with the First Cannistraro Indictment.

On 28 May 1987 Cannistraro was indicted in the First Cannistraro Indictment. This nine count indictment charged him with conspiracy to commit securities fraud, the creation and use of false nominee accounts in connection with the purchase and sale of securities, the creation and distribution of false misleading research reports, the interstate transportation of money obtained by fraud, mail fraud and obstruction of a grand jury investigation. At his arraignment on 12 June 1987, Cannistraro pleaded not guilty to all nine counts. However, on 21 September 1987, just before trial was scheduled to commence, Cannistraro entered a plea of guilty to all counts without

benefit of a plea agreement with the Government.

On the day of his guilty plea, Cannistraro testified under oath at a hearing held pursuant to Rule 11 of the Federal Rules of Criminal Procedure. In addition to responding to questions from the Government, Cannistraro made a voluntary statement at the Rule 11 hearing. After his plea of guilty was accepted, a detention hearing was held. As a result of the detention hearing, the conditions of bail for Cannistraro were modified and tightened.[22]

At a 2 November 1987 sentencing hearing, Cannistraro was sentenced to a total of eight years in prison followed by five years probation. He was fined $330,000 and ordered to pay restitution in the amount of $394,947.00. A trustee was appointed to disburse the money to the victims of his fraud. Cannistraro filed his Notice of Appeal concerning sentencing and other matters on 13 November 1987.

On 6 April 1989 the Third Circuit rejected all of his challenges on appeal and affirmed with the exception of a technical challenge to the sentence which he contended was based upon statistics compiled by the Probation Department. The sentence was vacated and the matter remanded for resentencing. *Cannistraro,* 871 F.2d at 1217.[23]

Three weeks after the Circuit remanded the matter for resentencing and more than one and one-half years after the Rule 11 proceeding, the detention hearing and the sentencing, Cannistraro filed, on 24 April May 1989, a motion to withdraw his plea of guilty to each of the nine counts of the First Cannistraro Indictment. Cannistraro alleged ineffective assistance of counsel and argued there was an inadequate factual basis to accept his guilty plea. The attack on the plea continues up until this time and is running a parallel track with this, the Superceding Indictment.

---

22. For a detailed discussion of the bail hearing, *see United States v. Cannistraro,* 694 F.Supp. 62, 64–69 (D.N.J.1988), *aff'd in part and remanded,* 871 F.2d 1210 (3d Cir.1989).

23. The Circuit expressly noted it had "no difficulty" with remanding the matter to me for

resentencing. The Circuit explained: "Cannistraro has failed to show a substantial reason, other than dislike of the sentence imposed, which would require us to reassign the case on remand." 871 F.2d at 1217 n. 6.

As explained earlier, Cannistraro filed his recusal motion in this case on 27 November 1989 and contended generally that I should recuse myself because of my involvement in the First Cannistraro Indictment.[24] The first prong of the Pollock Motion contends I had *ex parte* communications with Barry Goldsmith ("Goldsmith"), Assistant Chief Litigation Counsel for the SEC during the *pendency* of the First Cannistraro Indictment. The Pollack Motion also contends I have personal knowledge of disputed evidentiary facts in connection with the recusal motion. The Pollack Motion attempts to bootstrap the second prong by indicating I shall be a necessary witness for the recusal motion because of communications with Goldsmith.

The communications with Goldsmith concerned exclusively the appointment of a trustee in connection with the restitution assessed against Cannistraro at sentencing in the First Cannistraro Indictment. The letter to which Cannistraro refers and upon which he bases his allegations of so-called *ex parte* communications, is a letter, dated 11 February 1988, from Goldsmith (the "Goldsmith Letter"). The Goldsmith Letter does not make reference to anything concerning Cannistraro other than the appointment of the trustee for the restitution.

There is a stark contrast between the Cannistraro Recusal Motion and Cannistraro Brief and the Pollack Motion. For example, the Cannistraro Brief states:

**24.** Specifically, Cannistraro, in his pro se brief, contends as follows:

1) Judge Lechner listened to the Assistant U.S. Attorney interrogate Defendant concerning many of the events to be contested in the instant case.

2) Judge Lechner read a PSI report that discussed many of the alleged actions and events to be contested in the instant case.

3) Judge Lechner was subjected to non-supported prejudicial hearsay testimony at the September 24, 1987 detention hearing prejudicing Defendant.

4) Judge Lechner *may have had* numerous exparte communications during the post-conviction process of the 1987 case with SEC lawyers and investigators who are the plaintiffs in a pending civil action against Defendant on the same charges as the instant case.

5) Judge Lechner was reversed by the Third Circuit concerning his sentencing of Defendant on the 1987 case.

Judge Lechner MAY have had numerous ex parte communications DURING THE POST–CONVICTION PROCESS of the [First Cannistraro Indictment] with SEC lawyers and investigators who are plaintiffs in a pending civil action against [Cannistraro] on the same charges as the instant case.

Cannistraro Brief at 4, ¶ 4 (emphasis added). The Pollack Motion requests an order:

1. Setting a date for an evidentiary hearing on defendant Cannistraro's recusal motion and the allegation in connection with that motion that ex parte communications occurred between the Honorable Alfred J. Lechner and Barry Goldsmith, Esq., Ass't Chief Litigation Counsel, S.E.C. DURING THE PENDENCY of *United States v. Cannistraro*, Criminal No. 87–193; and

2. Disqualifying Judge Lechner under 28 U.S.C. [§§] 455(a) and 455(b)(1) from deciding defendant Cannistraro's Motion for Recusal because Judge Lechner has PERSONAL KNOWLEDGE of a disputed evidentiary fact relevant to the proceeding and WILL be a witness at the foregoing evidentiary hearing.

Pollack Motion at 1–2 (emphasis added).

The reference by the Pollack Motion to *ex parte* communications with the Assistant Chief Litigation Counsel of the SEC during the "pendency" of the First Cannis-

6) Judge Lechner during the sentencing and post conviction hearings of the 1987 case has made comments which would indicate that he already believes that Defendant is guilty of many of the charges in the 1989 indictment prior to the start of trail [sic] or even pre-trail [sic] motions.

7) Judge Lechner has heard testimony from Defendant's former trial attorney concerning their representation of privileged communications which relate to most of the events to be contested in the instant 1989 case.

Cannistraro Brief at 4–5 (emphasis added). Cannistraro has not identified any of the data to which he makes reference in items 1, 2, 3, 6 and 7 above other than by way of a general reference to the Rule 11 Hearing, the presentence report and the detention hearing. This was not corrected by Pollack.

traro Indictment is, at best, a curious reference. Cannistraro was sentenced on the First Cannistraro Indictment on 2 November 1987. Cannistraro filed his Notice of Appeal of the Judgment and Commitment Order on 13 November 1987; it was docketed on 7 December 1987. Accordingly, it appears that jurisdiction with regard to Cannistraro was then vested in the Court of Appeals. The First Cannistraro Indictment was then no longer pending in the district court.

The Goldsmith Letter was dated 11 February 1988 and dealt exclusively with the appointment of a trustee concerning the restitution ordered from Cannistraro in connection with the First Cannistraro Indictment. Succinctly stated, there was neither an *ex parte* communication nor action taken by me during the "pendency" of the First Cannistraro Indictment, as stated in the Pollack Motion.

With regard to the second prong of the Pollack Motion, the assertion that I have "personal knowledge of a disputed evidentiary fact relevant to the proceeding" (Pollack Motion at 2, ¶ 2), there is simply nothing to justify such a contention. There is no "disputed evidentiary fact related to this proceeding." The only basis for the assertion by Cannistraro that I *"may* have had numerous ex parte communications during the post-conviction process of [the First Cannistraro Indictment]", Cannistraro Brief at 4, ¶ 4 (emphasis added), is the Goldsmith Letter.[25] The extent of my discussion with Goldsmith was whether the Trustee to be appointed would be a New Jersey attorney or a New York attorney.

The Cannistraro Recusal Discovery Motion which included a request for a hearing was previously denied. The unsupported Pollack Motion, which is nothing more than a restatement of the Cannistraro Recusal Motion, albeit with a questionable overtone, is also denied.

The Cannistraro Recusal Motion also suggests I should recuse myself because of my exposure to certain data at the Rule 11 hearing, detention hearing and sentencing hearing in connection with the First Cannistraro Indictment.

*Discussion*

The two grounds upon which Bertoli, and apparently Cannistraro, base their motions for recusal are distinct and are analyzed separately.

*Rule 32*

■ The claim that I reviewed a presentence report in another case two years ago warrants recusal is based on Federal Rule of criminal Procedure 32(c)(1) which states, in pertinent part:

The [presentence] report shall not be submitted to the court or its contents disclosed to anyone unless the defendant has pleaded guilty ..., except that a judge may, with the written consent of the defendant, inspect a presentence report at any time.

*Id.*

The Supreme Court has commented on this rule and stated:

[T]he rule must not be taken lightly. Presentence reports are documents

**25.** It is interesting to note that Cannistraro displays more precision in making allegations than does Pollack. Significantly, Cannistraro suggests I "may" have had *ex parte* communications and emphasizes that it occurred during the "post-conviction" process. This is in contrast to the unsupported assertions by Pollack that this occurred during the "pendency" of the First Cannistraro Indictment and that I have personal knowledge of disputed evidentiary facts.

After the Notice of Appeal was filed on 13 November 1987, I no longer had jurisdiction and the First Cannistraro Indictment was no longer pending in the United States District Court. *Venen v. Sweet,* 758 F.2d 117, 120 & n. 2 (3d Cir.1985). With regard to the assertion of personal knowledge, this is nothing more than a

baseless *attempt to create suspicion and possibly generate an emotional reaction by anyone* reading the Pollack Motion. As the Goldsmith Letter indicates, the discussion concerned exclusively the appointment of a trustee, which was accomplished on 24 March 1988. There were no discussions concerning Cannistraro, his criminal or his civil matter other than the appointment of the trustee. This observation was made on 18 August 1988 in an opinion concerning several motions Cannistraro filed in connection with his first indictment. *United States v. Cannistraro,* 694 F.Supp. 62, 64 (D.N.J.1988). Indeed, it appears this "issue" was not even the subject of Cannistraro's appeal. *United States v. Cannistraro,* 871 F.2d 1210 (3d Cir.1989).

which the rule does not make available to the defendant as a matter of right. There are no formal limitations on their contents, and they may rest on hearsay and contain information bearing no relation whatever to the crime with which the defendant is charged. To permit the *ex parte* introduction of this sort of material to the judge who will pronounce the defendant's guilt or innocence or who will preside over a jury trial would seriously contravene the rule's purpose of preventing possible prejudice from premature submission of the presentence report. No trial judge, therefore, should examine the report while the jury is deliberating since he may be called upon to give further instructions or answer inquiries from the jury, in which event there would be the possibility of prejudice which Rule 32 intended to avoid. Although the judge may have that information at his disposal in order to give a defendant a sentence suited to his particular character and potential for rehabilitation, there is no reason for him to see the document until the occasion to sentence arises, and under the rule he must not do so.

*Gregg v. United States,* 394 U.S. 489, 492, 89 S.Ct. 1134, 1136, 22 L.Ed.2d 442 (1969).

The *Gregg* court had before it a situation where a presentence report about a defendant may have been viewed by the trial judge before the trial was completed. The case *sub judice* presents the different factual setting of a presentence report concerning Cannistraro and his First Indictment two years before the present matter.

■ Rule 32(c)(1) does not require recusal when a judge has reviewed a defendant's presentence report in another proceeding. *See United States v. Clark,* 605 F.2d 939, 941 (5th Cir.1979) (reading a presentence report after guilty plea later withdrawn not basis for recusal when presiding over jury trial). *See also United States v. Lyon,* 588 F.2d 581, 583 (8th Cir.1978), *cert. denied,* 441 U.S. 910, 99 S.Ct. 2005, 60 L.Ed.2d 381 (1979); *United States v. Montecalvo,* 545 F.2d 684, 685 (9th Cir.1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2184, 53

L.Ed.2d 229 (1977); *United States v. Bourque,* 541 F.2d 290, 296 (1st Cir.1976). The *Clark* court held that a review of a presentence report by a trial judge was not basis for disqualification "where the report had properly come to his attention during the performance of his judicial duties." 605 F.2d at 941.

The Third Circuit reviewing a trial judge who had read a presentence report before trying a defendant a second time noted that application of "the *Gregg* doctrine ... is not explicitly mandated." *United States v. Small,* 472 F.2d 818, 821 (3d Cir.1972). *Small* suggests a presentencing review of the presentence report by a trial judge very well might be warranted in some circumstances:

> Important to an application of the *Gregg* principles in any of these situations would be the Supreme Court's guideline in *Fallen v. United States,* 378 U.S. 139, 142, 84 S.Ct. 1689, 1691, 12 L.Ed.2d 760 (1964), that:
>
> > the Rules are not, and were not intended to be, a rigid code to have an inflexible meaning irrespective of the circumstances. Rule 2 begins with the admonition that "[t]hese rules are intended to provide for the just determination of every criminal proceeding. They shall be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay."
>
> In *Gregg,* the Court stated that "there is no reason" for a judge to see a presentence report until sentencing occurs. *Gregg v. United States,* 394 U.S. at 492, 89 S.Ct. 1134 [, at 1136]. *As the present case, and the other examples above, demonstrate, however, circumstances often may arise when the judge views a defendant's presentence report for legitimate purposes before trying him or presiding over his trial.*

*Id.* at 821–22 (emphasis added). The *Small* court referred to a balancing test.

> It thus becomes necessary to balance Rule 32's objective of preventing even the possibility of prejudice with the administrative convenience, simplicity of

procedure and prevention of delay implicit in having a single judge preside over a defendant's court appearances.

*Id.* at 822.[26]

Since *Small,* courts have had opportunity to consider these questions. A thorough analysis of these issues was presented in *United States v. Frezzo,* 563 F.Supp. 592 (E.D.Pa.1983), *aff'd mem.,* 734 F.2d 8 (3d Cir.), *cert. denied,* 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984). In that case the defendant moved to have the judge recuse himself from presiding over a criminal jury trial for conspiracy and receiving stolen property because he had read a presentence report following defendant's conviction for violation of the Federal Water Pollution Act. *Id.* at 593. Defendant also contended the judge's exposure to information about him presented by the Government in a hearing to reduce sentence created an appearance of bias. *Id.*

The *Frezzo* court stated that the recusal motion was based on *Gregg* principles, not on Section 455(a).[27] *Frezzo*'s review of the case law on this issue, some of which has already been cited, merits repeating.

The Court's decision not to recuse itself in the present case is supported by the holdings, and the reasoning, of virtually every case which has considered the question of recusal in similar circumstances. At least two courts have stated flatly that information contained in presentence reports properly brought to a judge's attention during the performance of his duties is not a basis for disqualifying the judge. *United States v. Clark,* 605 F.2d 939, 940–41 (5th Cir.1979); *United States v. Montecalvo,* 545 F.2d 684, 685 (9th Cir.1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2184, 53 L.Ed.2d 229 (1977). As the Court in *Clark* stated, quoting *Smith v. United States,* 360

F.2d 590, 592 (5th Cir.1966), the suggestion that disqualification is proper because a judge has viewed a presentence report is "highly untenable in light of the decisions that a trial judge, who is familiar with the defendant's background by reason of having tried him in previous cases, is not thereby disqualified to try the same defendant in subsequent cases." 605 F.2d at 941. Courts have also explicitly held that where a judge is faced with a trial of a defendant whose presentence report he has read in a prior case refusal to recuse is proper.... A number of cases have also considered further proceedings in the same trial after a presentence report has been reviewed, without violation of Fed.R.Crim.P. 32, and have concluded that recusal was not required.... Finally, several cases, while not specifically discussing the problem of presentence reports, have held that prior judicial exposure to a defendant does not constitute grounds for recusal.

*Id.* at 595–96 (citations omitted).

While noting that it "may be more than *Small* requires" the *Frezzo* court applied the balancing test. *Id.* at 594. The test weighs the "possibility of prejudice with the administrative convenience, simplicity of procedure and prevention of delay implicit in having a single judge preside over a defendant's court appearances." *Small,* 472 F.2d at 822.

There is no possibility of prejudice in the case *sub judice.* Bertoli was not a defendant in the First Cannistraro Indictment. Neither Bertoli nor Cannistraro has indicated action or comment to even suggest prejudice to one or the other of them. Bertoli contends:

"Your Honor reached the conclusion that 'Liquidation Control and Toxic Waste

---

**26.** The Circuit noted in *Small* that:

The conflicting values involved in applying the teaching of the *Gregg* case to the present appeal need not be reconciled because the judgment must be reversed on other grounds. The same questions, however, are likely to arise again. The complex nature of the values at stake merits consideration by the district courts.

472 F.2d at 822.

**27.** The Court noted:

The appearance of bias as claimed by the defendant is based solely upon the fact that this Judge, more than four years ago, reviewed a presentence report prior to the imposition of sentence upon defendant and presided over post-trial proceedings.

*Frezzo,* 563 F.Supp. at 593.

were used ... to defraud, to manipulate, to swindle. There is no way around it.' (Sentencing Hearing, United States v. Cannistraro, 11/2/87 p. 48). Your Honor could only have reached that conclusion based on the presentence report, since Mr. Cannistraro's conviction was based on a plea of guilty."

Bertoli Short Amendment at 2. The Government points out that the same conclusions were ascertainable from Cannistraro's admissions.[28]

These observations do not prejudice Bertoli; nothing is said about him or his conduct. Only Cannistraro and his dealings with the corporations are mentioned. Even *if* there were some slight prejudice as a residue from the First Cannistraro Indictment, courts have held that the determination of guilt by a jury mitigates the possibility of such prejudice. *Frezzo*, 563 F.Supp. at 595; *United States v. Ferretti*, 508 F.Supp. 913, 916 (E.D.Pa.1981).

Against this minimal chance of any prejudice to Bertoli or Cannistraro is the substantial burden such a recusal would place on the court in this instance and in the future. As the *Frezzo* court noted:

[A]dministrative burdens are raised by the transfer itself, burdens which would be substantial for the court system as a whole if recusal were held to be justified on the basis of the allegations the defendant has made here. Severe burdens would be placed on the judicial system if a judge had to withdraw from a case whenever he or she had presided over proceedings in the same or a related case that provided nonevidentiary information about a defendant.... The reasoning supporting recusal in the present case could extend to require recusal where a judge heard evidence later suppressed, or presided over bail or probation revocation hearings. Such reassignment would impose unnecessary burdens, and could also, since recusal is often at the defendant's request, subvert the purpose of this Court's system of random assignment of judges to cases.

563 F.Supp. at 595 (citations omitted).

Given that neither a showing of prejudice nor even the appearance of prejudice has been made concerning Bertoli or Cannistraro, Rule 32(c)(1) does not require recusal.

### Section 455(a)

#### The First Cannistraro Indictment

Section 455(a) states "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might *reasonably* be questioned." 28 U.S.C. § 455(a) (emphasis added). To ensure the impartiality of the judiciary section 455(a) and its companion section 455(b) are strict and do not require a motion by the parties to take effect.

A judge must determine, *sua sponte*, whether any of the grounds for disqualification enumerated in that provision are

---

**28.** The Government notes Cannistraro admitted:
1. That he agreed with William Fritz, portfolio manager of the M & I Growth Fund, that Fritz would cause his fund to purchase blocks of [Liquidation Control] securities and, in exchange therefore, Cannistraro would aid Fritz in establishing a nominee account at Monarch Funding Corp. ("Monarch") (Transcript of Cannistraro's plea allocution ("Tr.") at 36);
2. That he (a) aided and abetted Fritz in obtaining the allocation of LCI stock for Fritz' nominee account in December 1982; (b) was aware of the sale of the LCI stock by the Fritz nominee account in February 1983 at a profit of approximately $5,500; and (c) aided and abetted Fritz in purchasing and selling Toxic Waste securities through the Fritz nominee account for a profit of approximately $50,000 (Tr. at 37–39);
3. That he (a) proposed to Bynam Vickory, portfolio manager of the Aggressive Growth Shares Fund, that Vickory purchase 25,000 shares of LCI for the fund's account; (b) assisted Vickory in establishing a nominee account at Monarch; and (c) obtained an allocation of Toxic Waste stock for Vickory's nominee in the initial public offering (Tr. at 40–41);
4. That he failed to disclose in his Toxic Waste research reports that he had nominees holding Toxic Waste securities for his own benefit, and failed to disclose his arrangements with Fritz and Vickory (Tr. at 35, 50); and
5. That he caused his false and misleading Toxic Waste research reports to be disseminated to the investing public with the intent of causing an increase in the price of the securities (Tr. at 35).
Government Opposition to Bertoli at 25–26 and Exhibit 6.

present in a case. If any ground specified in section 455(b) is present, he must disqualify himself immediately. If such specific grounds are not present, but if, for any reason, "his impartiality might reasonably be questioned[,]" he must either disqualify himself or seek a waiver after "full disclosure on the record." ... All this must be done, if necessary, on his own motion. As the Seventh Circuit has noted, section 455 "impose[s] no duty on the parties to seek disqualification nor [does it] contain any time limits within disqualification must be sought."

*United States v. Schreiber,* 599 F.2d 534, 539 (3d Cir.) (citations omitted), *cert. denied,* 444 U.S. 843, 100 S.Ct. 86, 62 L.Ed.2d 56 (1979).

■ The test when considering a recusal motion is whether a reasonable person aware of all the circumstances would have doubts concerning the impartiality of the particular judge. *Martorano,* 866 F.2d at 67; *Dalfonso,* 707 F.2d at 760. The existence of actual prejudice is not required. *United States v. Sciarra,* 851 F.2d 621, 635 (3d Cir.1988). However, the basis for recusal must arise from the incidents or activities outside of the judges' trial role; the Third Circuit has described this as extrajudicial bias.

"Extrajudicial bias" refers to a bias that is not derived from the evidence or conduct of the parties that the judge observes in the course of the proceedings.

*Johnson v. Trueblood,* 629 F.2d 287, 291 (3d Cir.1980) (citations omitted), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981).

■ In *United States v. Sinclair,* 424 F.Supp. 715 (D.Del.1976), the judge denied a motion pursuant to Section 144 to disqualify himself based upon the allegations of defendant that the judge had a personal prejudice against him and bias in favor of the United States because the judge previously sentenced him, because the judge scheduled the trial promptly within the

Speedy Trial Act and because of pretrial publicity against the defendant.

The trial court noted that:

Personal bias is defined as an attitude arising from extrajudicial sources that results "in an opinion on the merits on some basis other than what the judge learned from his participation in the case," ... or results in an "attitude toward [the] petitioner that is significantly different from and more particularized than the normal, general feelings of society at large against convicted wrongdoers." ...

On the other hand, it is equally clear that a claim of bias or prejudice based on judicial knowledge gained from prior hearings or other cases is not sufficient grounds for disqualification of a judge whether it be from prior judicial exposure to the defendant or prior judicial rulings adverse to the defendant in the same or different cases.

*Id.* at 718 (citations omitted). As the *Sinclair* court observed: " 'the bare allegation that other inflammatory information had come to the judge's attention is far too general to be the basis for disqualification.' " *Id.* at 719 (quoting *United States v. Roca–Alvarez,* 451 F.2d 843, 848 (5th Cir.1971), *reversed on reh'g on other grounds,* 474 F.2d 1274 (5th Cir.1973)).

In the matter entitled *In re Martin–Trigona,* 573 F.Supp. 1237 (D.Conn.1983), a motion for disqualification which was brought pursuant to 28 U.S.C. §§ 144 [29] and 455 was denied. It appears that the defendant, Martin–Trigona, is an individual known for extensive and vexatious litigation in the federal courts. As found by the district judge, he demonstrated a pattern of demonstrating admiration or respect initially for the judge to whom his cases were assigned, but that admiration or respect dissipated with the first unfavorable ruling. Thereafter, Martin–Trigona would file suit against the judge, the judge's family, his attorneys and anyone else within range. 573 F.Supp. at 1240. In *In re Martin–Tri-*

---

**29.** The requirements of a recusal motion under 28 U.S.C. § 144 are discussed *infra* at page 1156. Neither Bertoli nor Cannistraro has invoked section 144 as a basis for their respective motions.

*gona*, after initially praising the district judge, Martin–Trigona sought his recusal because of adverse rulings.

The judge considered the motion under both section 144 and section 455. He noted: "Construing the motion to recuse as a motion filed pursuant to 28 U.S.C. § 455, the court finds that in the totality of the circumstances, and in the exercise of the court's discretion under that statute, recusal is not appropriate in this instance." *Id.* at 1242. The judge noted:

> [I]t *is* clear that a judge is not disqualified under 28 U.S.C. § 455 (or under 28 U.S.C. § 144 for that matter) merely because a litigant sues or threatens to sue him.... Neither is a litigant's intemperate and scurrilous attack on a presiding judge a valid ground for recusal. ... There is an obligation on the part of a judge to decline to recuse himself for a "relatively trivial reason." ... "It is a judge's duty to refuse to sit when he is disqualified but it is equally his duty to sit where there is no valid reason for recusa[l]." [30]

The right to an impartial judge cannot be advanced so broadly as to permit the parties to engage in "judge-shopping" under the guise of a motion to recuse, ... or to permit a litigant to disqualify without reasonable grounds a succession of judges for the apparent purpose of impeding the administration of justice.

28 U.S.C. § 455 as amended establishes an objective standard for recusal, known as the "appearance of justice" rule. ... The appropriate test for disqualification under § 455(a) is whether a reasonable person with knowledge of all the facts would be led to the conclusion that the judge's impartiality might reasonably be questioned.

573 F.Supp. at 1243 (footnote and citations omitted; emphasis in original).

■ The allegations in this case, however, are simply too tenuous and incredible to create even the appearance of impropriety with regard to either Bertoli or Cannis-

traro. A reasonable person—the average person on the street with knowledge of *all* the facts and circumstances—would not question my ability to sit impartially on this case. *Id.* at 1237.

Bertoli argues that viewing the presentence report and hearing allegations of criminal conduct by Bertoli during the First Cannistraro Indictment requires recusal under 455(a). As previously noted, even in cases where the same defendant's presentence report had been viewed by a judge, recusal on grounds of prejudice was not required. *Clark*, 605 F.2d at 941; *Frezzo*, 563 F.Supp. at 594–95. This applies *a fortiori* concerning the Bertoli Recusal Motion; the presentence report dealt with Cannistraro's First Indictment.

Bertoli also seeks my recusal because I heard allegations by Cannistraro's attorney linking Bertoli to illegal activities. 3 November 1989 Bertoli Letter Brief at 1. The Transcript of Proceedings in *United States v. Cannistraro*, 2 November 1987 ("Nov. 87 Tr. at ——") reveals that Cannistraro's attorney asserted that the U.S. Attorney's office had "chased" Bertoli for years. *Id.* at 17, 19. At the sentencing hearing, Cannistraro's attorney attempted to put the Governments' motives in doubt and to cast the blame for his client's actions elsewhere. Cannistraro's attorney, David O'Connor, Esq., stated that the Government was attempting to reach Bertoli through Cannistraro. *Id.* at 17. O'Connor made no outrageous or derogatory statements about Bertoli. He never stated Bertoli was guilty of anything. In fact, he described Bertoli as "charming" and "very pleasant." *Id.* at 19.

Even if O'Connor or the Government made derogatory statements about Bertoli, there would not be grounds for recusal. Section 455(a) motions "must rest on the kind of objective facts that a reasonable person would use to evaluate whether an appearance of impropriety had been created, not on 'possibilities' and unsubstanti-

---

**30.** The test applied here is whether a reasonable person, aware of all of the facts, would question my impartiality.

ated allegations." *Martorano*, 866 F.2d at 68.

In *United States v. Cowden*, 545 F.2d 257 (1st Cir.1976), *cert. denied*, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977), the trial judge had denied a recusal motion based on the fact he had presided over the jury trials of four others indicted with the defendant. Cowden argued the judge might "appear to have prejudged the issues presented in his case." *Id.* at 265. The First Circuit rejected this claim.

> Insofar as the judge's presiding over the prior trials of Cowden's codefendants may have resulted in his learning about facts damaging to Cowden, the situation is not much different from when a presiding judge learns about evidence, later excluded, damaging to a defendant at a *voir dire* or bench conference in the same proceeding. While judges attempt to shield themselves from needless exposure to matters outside the record, they are necessarily exposed to them in the course of ruling on the admission of evidence; and the judicial system could not function if judges could deal but once in their lifetime with a given defendant, or had to withdraw from a case whenever they had presided in a related or companion case or in a separate trial in the same case.

*Id.* at 265–66.

In *Cowden* the trial judge had presided over multiple jury trials, not a plea and sentencing hearing. The statements by the First Circuit apply with greater force in this case. Anything said about Bertoli or Cannistraro and heard in the course of sentencing cannot be considered "extrajudicial" in the sense that I learned or had knowledge of it from sources outside my judicial duties. *Sciarra*, 851 F.2d at 634–35 n. 8.

I made no reference to Bertoli at any time during the proceedings in the First Cannistraro Indictment. There is nothing to suggest I may have formed an unfavorable impression or any impression regarding Bertoli. All of my comments focussed on Cannistraro. Nov. 87 Tr. at 46–50. No mention is made of Bertoli or indeed any associates of Cannistraro. Considering the mild form of any allegations about Bertoli, the two year lapse of time between the sentencing in the First Cannistraro Indictment, the allegation and this case, the nature and aim of an attorney's comments during sentencing and the fact that I did not even acknowledge those arguments which attempted to shift blame to the Government or Bertoli, it would be unreasonable to impute partiality or its appearance to hearing such comments.

### Bertoli's Allegations

■ Bertoli has made a number of disparaging statements all in connection with the First Cannistraro Indictment and the sentencing of Cannistraro. The statements include the following:

> Your actions as a Judge in that matter [the First Cannistraro Indictment] is [sic] an absolute disgrace to the robes you wear.

> The opposition to your nomination as a Judge was well founded in that your Judicial Temperament and unfair mannerism requires you in fairness to resign from the bench.

Bertoli Amended Brief, Exhibit A.

> This letter is a formal complaint and request to reprimand and take such other action including impeachment of Alfred J. Lechner, Jr., who is a disgrace to the Federal court and all members of the Judiciary....

> Mr. Lechner has displayed a lack of judicial temperament and truly needs psychiatric help and analysis.

Bertoli Amended Brief, Exhibit B.

> It is apparent to me that he has been used as a willing tool of the administration to wreck [sic] havoc upon anyone who attempts to criticize the poor administration of the "Super Fund."

*Id.* I have never responded to the allegations of Bertoli. The Bertoli Recusal Motion represents the first instance in which Bertoli's accusations were formally raised in any forum. Indeed, those statements were not the subject of any comment by anyone before this opinion.

The Third Circuit has indicated that criticism directed toward a judge does not automatically provide grounds for recusal. In *Martorano* a judge had been attacked in the press for favoring an attorney and Martorano claimed that as a client of the attorney he had been given a harsher sentence so that the judge could refute the charges. He also alleged that because of allegations made by a codefendant, the judge harbored a prejudice against him.[31] The *Martorano* court noted that "[b]y training and inclination, judges meet media criticism of their actions with robust insensitivity." 866 F.2d at 69. The Third Circuit rejected the notion that mere allegations, even in the press or by a close associate of defendant would affect a judge's impartiality. The Circuit quoted the district court with approval stating:

> only "speculation" would lead a reasonable person to conclude, absent any evidence, that [the trial judge] had reimposed the same sentence not for the factors that underlay his original choice, but to rehabilitate the damage allegedly done to his reputation by the newspaper stories. ... *Again, since the test for recusal is a reasonable person one, a movant must supply some objective facts that support his position, not mere speculation.*

*Id.* at 68 (emphasis added). Bertoli has not come forward with objective facts to support his position. He has made accusations but demonstrated no word or action by me to indicate the threat or appearance of partiality.

It is significant that the Bertoli Recusal Motion is filed pursuant to 28 U.S.C. § 455(a). The motion for recusal or disqualification was not filed pursuant to 28 U.S.C. § 144. Section 144 states:

> Whenever a party to any proceeding in a district court makes and files a timely

and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of the adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may only file one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

*Id.*

As noted above, section 144 requires not only an affidavit of the party but, as well, a "certificate of counsel of record stating that it [the application as a whole [32]] is made in good faith." *Id.* In the case of *In re Union Leader Corp.*, 292 F.2d 381 (1st Cir.), *cert. denied*, 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961), the First Circuit found that an application for the recusal of the judge "scarcely merits a lower standard" than that imposed under Fed.R. Civ.P. 11. *Id.* at 385.

Although the Bertoli Recusal Motion is made under section 455, not section 144, counsel for Bertoli submitted a certificate of good faith.[33] The 2 November 1989 Sachs Affidavit gratuitously put in issue the good faith of the Bertoli Recusal Motion. Less than three weeks later, the Bertoli Reply Brief was filed. Significantly, this Reply Brief states: "Defendant Bertoli's recusal motion is not based on a claim that Judge Lechner is in fact biased against him." Bertoli Reply Brief at 2.

---

**31.** *Martorano* was decided under the appearance of bias standard under section 455(a); actual bias was not at issue. *Martorano*, 866 F.2d at 67.

**32.** *See In re Union Leader Corp.*, 292 F.2d 381, 385 (1st Cir.), *cert. denied*, 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961), where the court interpreted the word "'it' in the statute as referring

to the application as a whole, and [held] that counsel's good faith must be stated." *Id.*

**33.** Specifically, an affidavit of Sachs states: "The motion of defendant Bertoli for an Order of Recusal under 18 [28] U.S.C. [§] 455(a) is made in good faith." 2 November 1989 Sachs Aff. at ¶ 5.

All of the conduct which forms the basis for this application originates with Bertoli. Bertoli neither alleges nor implies any conduct on my part to form the basis for the section 455 application. In light of the conduct of Bertoli, the selection of section 455, the exclusion of section 144 as the basis for his recusal motion and the statement of his counsel that there is no prejudice in fact, my impartiality cannot "reasonably" be questioned.

Clearly, Bertoli does not believe I harbor any prejudice against him or bias in favor of the Government. In light of this and of the generally accepted principle that the defendant has a right to be tried before an unbiased judge, the issue presented is whether public confidence in the courts may require recusal. Accordingly, it is the public perception which must be addressed. If this claim is sufficiently meritorious, corrective action should be taken immediately, as requested by Bertoli and his counsel.

As mentioned, a section 144 application requires a certificate of counsel that the application is made in good faith. As noted in *In re Union Leader Corp.*: "If a certificate is to serve the purpose of shielding a court which cannot test the truth of the claimed facts, it should at least carry the assertion that counsel believes the facts alleged to be accurate and correct." 292 F.2d at 385. No such safeguard is offered pursuant to section 455. The apparent reason for the lack of such a safeguard in section 455 is that pursuant to section 144 the filing of such an affidavit automatically triggers other proceedings. Pursuant to section 455, however, the judge against whom the application is filed must make appropriate findings based upon the submissions. In making those findings, it is obvious that such a judge must inquire into the basis for the application and must exercise appropriate discretion.

*In re Union Leader Corp.* concerned a writ of mandamus to order a judge to revoke his actions striking an affidavit of bias and prejudice and to order him to disqualify himself from conducting further proceedings. The stricken affidavit was based upon an alleged attack on the judge by a newspaper involved in a private antitrust action and the judge's reactions to that publication. Apparently editorials were published during the prior decade about the judge and his conduct in unrelated matters.

The judge was confronted with a situation where a reporter for the petitioner seeking the mandamus telephoned the judge at his home to write a follow-up story. The judge informed the reporter that the petitioner's article was libelous but refused to give any further follow-up. The reporter was not content and followed the judge to his chambers hoping to be more productive. When confronting the judge with regard to any further comment, the judge responded that the petitioner's actions were contemptible. The reporter printed that comment. Shortly thereafter, the petitioner had its reporter prepare an affidavit and account of the conversations with the judge which the petitioner retained "in case a contingency arose." The First Circuit found that the reference to retaining the affidavit in case a contingency arose "obviously, ... meant if it should later conclude to file an affidavit of prejudice" this documentation would be necessary. *Id.* at 387.

The First Circuit found that the action of the judge in striking the affidavit was correct and it did not issue a mandamus. Some of its comments with regard to the matter are instructive. It noted that "neutrality in the absolute sense cannot be expected. 'Personal bias or prejudice' calls only for practical objectives. For example, prior judicial views will not disqualify." *Id.* at 388 (citation omitted). The Circuit also observed:

> [A] judge is not prevented from sitting because he comes into every case with a background of general personal experience and beliefs. ... There must be something unique. Nor will a judge's ordinary and natural reactions to the conduct of, or evidence developed about, a party in a case before him create a disqualification....

In sum, a judge must be presumed to be qualified, and there must be substan-

tial burden upon the affiant to show grounds for believing the contrary.

*Id.* at 388–389 (citations omitted).

The Circuit noted that in a theoretical sense there were two levels to the claim of bias that were presented by the petitioner. The first was the fact that the judge was attacked and the second was the judge's response to the attacks. It did not find the first prong, the attack, sufficient. "A judge lives in an atmosphere of strife, in which, by nature and experience, he is expected to be a man of 'fortitude.'" *Id.* at 389 (citation omitted).

The Circuit noted that a judge must "continually rule against one party or another. No judge can be so sanguine when asked to believe that he is never the object of disapproval and criticism directed to something more personal than his abstract judicial actions. If such disapproval is brought openly to his attention, he does not automatically change from benign to biased." *Id.* With regard to the first prong, the attack, the Circuit noted: "We have found no case which suggests that an affidavit must be ruled to be sufficient simply because it might be natural for a judge to have resented something said about him." *Id.*

The Circuit next turned to the reaction of the judge to the attack. It noted that the petitioner complained that the judge expressed the opinion the petitioner was seeking to create grounds to disqualify him. "This was a serious charge of misconduct. ... During oral argument petitioner conceded that if it had published these articles for the purpose of disqualifying the judge, it would have constituted contempt.[34] Petitioner, of course, denies that that was its purpose. Whether the judge was correct in his conclusion is a question of fact. Petitioner may have had other motives. But

we cannot label the judge's view unwarranted." *Id.* at 390 (footnote omitted).

This is precisely the situation which is presented in the Bertoli Recusal Motion. There is no comment or conduct on my part, as there was in *In re Union Leader Corp.*, upon which to base a request for disqualification. The only event here is the attack by Bertoli. The First Circuit went on to note in *In re Union Leader Corp.*:

It does not seem irrelevant to compare the vehemence with which petitioner contends that it would look badly for its case to be tried by a judge who spoke unfavorably of its conduct, and its industry in seeking out such expressions and printing them.

A judge's reasonable belief that a party was acting with a purpose of disqualifying him, his conclusion that such action was contemptuous and reprehensible, and even a very considerable showing of irritation, is [sic] in no way equivalent to personal bias and prejudice.

*Id.* Here, even if a reasonable person concluded that Bertoli's conduct was for no reason other than for the purpose of disqualifying me, such a view would not be unwarranted in light of the totality of the situation and Bertoli's prior conduct.

In this case, the distinguishing point is that there was no response or comment by me; there has been no comment that the conduct of Bertoli is contemptuous and reprehensible (although such observations by a reasonable person may not be unwarranted) and there has been no showing of irritation, much more a considerable showing, as evidenced by the judge in *In re Union Leader Corp.* As the Circuit noted: "A party cannot engage in conduct which has the outward appearance of being improper, and then complain of the consequences

---

**34.** Significantly, counsel to Bertoli made a similar concession during oral argument. Sachs stated:

I would say to your Honor if this Court believed and found as a matter of fact that a defendant in this case, Mr. Bertoli, in fact, two years ago in November, 1987 knew he was going to be indicted some two years later and wrote the letters in question with a specific intent to skew the system of justice, and I'll

put in in as harsh a way I can, in other words, to say, all right, Judge Lechner, come hell or high water you're not going to sit on my case, then I couldn't sit here and argue to you that kind of action should be condoned.
29 Jan. 1990 Tr. at 17–18. Of course, Bertoli knew in June 1987, some five months before he wrote the letters at issue, he was a primary subject of a criminal investigation. *See* note 20, *supra.*

when its conduct is taken at face value." *Id.* at 391.

As previously quoted, Bertoli states his: "Recusal motion is not based on a claim that Judge Lechner is in fact biased against him. Accordingly, the cases decided under § 144 have no application to the present motion." Bertoli Reply Brief at 2. Accordingly, it appears Bertoli contends neither Section 144 nor Section 455(b)(1) is applicable to his Recusal Motion.[35]

Bertoli contends:

The Government's reliance on cases decided under 28 U.S.C., § 144, and its mistaken remonstration of defendant Bertoli for failing to do so, may perhaps be attributable to its confusion over the applicable standard. Nonetheless, the § 144 cases cited at pages 11–15 of the Government[ ] [Opposition to Bertoli] are simply irrelevant because the only inquiry facing those Courts was whether actual bias existed.

Bertoli Reply Brief at 1–2. This contention is incorrect.

In *United States v. Sibla,* 624 F.2d 864 (9th Cir.1980), the Court reviewed a denial of a recusal request. This was a situation where the defendant was pro se defending against two counts of willful failure to file income tax returns. During the course of pretrial hearings, the district judge admonished defendant about the frivolity of his defense and that the defendant would be "in great trouble in connection with the defense of [his] case if he relied" on his arguments. *Id.* at 866. The defendant filed the motion pursuant to 28 U.S.C. § 144 and filed an accompanying affidavit.

The Circuit compared sections 144 and 455. The *Sibla* court stated: "The test for personal bias or prejudice in section 144 is identical to that in section 455(b)(1), and the decisions interpreting this language in section 144 are controlling in the interpretation of section 455(b)(1)." 624 F.2d at 867. As noted in *Sibla:*

However, we have ruled that section (b)(1) simply provides a specific example

of a situation in which a judge's "impartiality might reasonably be questioned" pursuant to section 455(a). ... Sibla has not alleged grounds for recusal other than those relating to bias or prejudice stemming from the district judge's courtroom remarks. Therefore, the question before this court is whether the district judge erred in refusing to recuse himself for personal bias or prejudice pursuant to section 144 or section 455(a) & (b)(1). The same substantive standard will be applied to each section.

*Id.*

In *United States v. Conforte,* 624 F.2d 869 (9th Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980), defendants were convicted of four counts of evasion of employment taxes. There was a motion to disqualify the trial judge for prejudice against the defendants. In *Conforte* there was a question as to the timeliness of the application to disqualify and it was found that due diligence was lacking. *Id.* at 869. It was found that defendants were on notice with regard to the complained of activity long before the trial began.

The judicial activity complained of in *Conforte* was the fact that the trial judge, a member of the Board of Trustees of the University of Nevada, advised the University against the acceptance of funds from the defendant, the operator of a house of prostitution. It was noted the judge mentioned the defendant was not good for Reno. As well, the judge, as president of a civic society, denied, on court stationery, an application for membership made by the defendant.

The Circuit noted: "It is reasonable to expect a judge to advise against involving educational institutions with brothel owners or felons, and we would not think that because of this advice the judge was unable to give the defendant a fair trial." *Id.* at 881.

---

**35.** The Pollock Motion attempts to invoke section 455(b)(1). This reliance is inapposite, as explained in this opinion.

With regard to disqualification for bias or prejudice, the court noted:

> We think the test under either [section 455] (a) or (b) is the same, namely, whether or not given all the facts of the case there are reasonable grounds for finding that the judge could not try the case fairly, either because of the appearance or the fact of bias or prejudice. We find no reasonable grounds for questioning the judge's impartiality because of bias or prejudice. While bias or prejudice may spring from many sources, often extrajudicial in their origin, the negative bias or prejudice of the kind alleged here will disqualify only if it is an attitude or state of mind that belies an aversion or hostility of a kind or degree that a fair-minded person could not entirely set aside when judging certain persons or causes. It is an animus more active and deep-rooted than an attitude of disapproval toward certain persons because of their known conduct, unless the attitude is somehow related to a suspect or invidious motive such as racial bias or a dangerous link such as a financial interest, and only the slightest indication of the appearance or fact of bias or prejudice arising from these sources would be sufficient to disqualify.

*Id.* at 881.

With regard to the interpretation of section 455(a) and 455(b)(1), the court noted: " 'It would be incorrect as a matter of statutory construction to interpret section 455(a) as setting up a different test for disqualification for bias or prejudice from that in section 455(b)(1).' " *Id.* at 880 (citing *United States v. Olander*, 584 F.2d 876, 882 (9th Cir.1978), *vacated on other grounds sub nom. Harington v. U.S.*, 443 U.S. 914, 99 S.Ct. 3104, 61 L.Ed.2d 878 (1979)).

Accordingly, section 455(a) is interpreted the same way as section 455(b)(1) is interpreted and section 455(b)(1) is interpreted the same way as section 144 is interpreted, notwithstanding the contention of Bertoli that "the cases decided under section 144 have no application to the present motion." Bertoli Reply Brief at 2. In *Olander*, as cited by *Conforte*, the court "held that the decisions interpreting section 144 are also controlling in the interpretation of the bias and prejudice language in section 455(b)(1)." *Conforte*, 624 F.2d at 880 (citing *Olander*, 584 F.2d at 882).

Significantly, there is no general conduct or disposition of mine to form the basis for this motion. Indeed, there is no specific conduct or disposition of mine which is at issue in either the Bertoli or the Cannistraro Recusal Motion.

The sole conduct at issue in the Bertoli Recusal Motion is the conduct of Bertoli. The substantive test for bias or prejudice is identical for either section 144 or for section 455(a) or (b)(1). *Id.* However, the procedural requirements of these two sections do differ. As mentioned, section 144 expressly conditions relief upon the filing of a timely and legally sufficient affidavit together with a certificate of counsel of record stating that the motion is made in good faith. Section 455 on the other hand has no procedural requirements and is directed to the judge rather than the parties. In addition, section 455 does not have a provision for referral of the question of recusal to another judge.

A section 144 affidavit is not legally sufficient unless it specifically alleges facts which fairly support the contention that the judge exhibits bias or prejudice directly towards a party which stems from an extrajudicial source. *Sibla*, 624 F.2d at 867. "As with section 144, the provisions of section 455(a) and (b)(1) require recusal only if the bias or prejudice is directed against a party and stems from an extrajudicial source." *Id.* at 869.

The facts which Bertoli alleges support his contention of bias or prejudice do stem from an extrajudicial source—Bertoli himself, by his gratuitous comments with regard to the sentencing of Cannistraro in the First Cannistraro Indictment. Bertoli has not demonstrated bias or prejudice or an appearance of either on my part; there is simply no basis for his application.

The *Frezzo* court noted the importance of extrajudicial bias in an analysis such as this:

Most courts which have considered § 455(a) have held that the determination whether a judge's impartiality might reasonably be questioned is to be made solely on the basis of conduct extrajudicial in nature. *Davis v. Board of School Commissioners of Mobile Cty.,* 517 F.2d 1044, 1052 (5th Cir.), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); . . . . Another Court's position on this question is unclear. *Compare United States v. Coven,* 662 F.2d 162, 168 (2d Cir.1981) (fact that allegedly prejudicial information is learned in a judicial rather than a personal capacity is "relevant" to the analysis of the appearance of impropriety) [*cert. denied,* 456 U.S. 916, 102 S.Ct. 1771, 72 L.Ed.2d 176 (1982) ]; *with In re International Business Machines Corp.,* 618 F.2d 923, 929 (2d Cir.1980) ("We conclude that under section 455(a) the bias to be established must be extrajudicial and not based upon in-court rulings.") The Third Circuit has approved the *Davis* holding, and stated that "[i]nsofar as the policy behind § 455 is concerned with matters of potential influence which exist 'outside the courtroom' we agree that the primary inquiry ought to be into extrajudicial conduct." *Mayberry v. Maroney,* 558 F.2d 1159, 1162 n. 16 ( [3d Cir.] 1977). Even where conduct in a judicial context is considered, however, it will serve to disqualify only in "exceptional circumstances," where the conduct reflects pervasive bias and prejudice.

*Frezzo,* 563 F.Supp. at 597 (some citations omitted). Other conditions such as a prohibition against judge shopping and the conduct of litigants may be weighed. *See Dalfonso,* 707 F.2d at 760–61; *Haas v. Pittsburgh National Bank,* 627 F.2d 677, 680 (3d Cir.1980).

*In re United States,* 666 F.2d 690 (1st Cir.1981) concerned a review, pursuant to writ of mandamus, of a trial judge's denial of a motion to disqualify himself under section 455(a). The essence of the Government motion to disqualify was the judge's past and present close professional relationship with former Massachusetts Governor John Volpe, the defendant's assistance to the governor during a 1966 legislative session and the judge's own reported involvement in that proceeding as the governor's legal counsel. In addition, it appears the judge, who served during that legislative session as legal counsel, was also part of the governor's "kitchen cabinet" and was the only person apart from the chief secretary to have direct access to the governor. There was also evidence of the long personal friendship with the governor.

There was wide publicity after a mistrial following a twenty-five day trial. The publicity suggested that the judge had a bias in favor of the defendant based upon his association with Governor Volpe. Apparently, the defendant was of considerable assistance or attempted to be of considerable assistance to the governor some fifteen years earlier.

Before reviewing the circumstances and finding no basis to reverse the denial of the motion to disqualify, the First Circuit set out the standards for review. It noted the case and particularly the issue of partiality had been broadly publicized and the claim of bias could not be labeled as frivolous; therefore it took the matter pursuant to the writ of mandamus on an interlocutory basis. Significantly, it cited *In re Union Leader Corp.,* a section 144 case, with regard to the necessity to maintain public confidence in the court system, a section 455(a) consideration. *Id.* at 694.

It noted the "first and most obvious policy" is that courts must actually be and must appear to be free of bias or prejudice. *Id.* It noted the situation must be viewed through the eyes of an objective person. A "second but less obvious policy" is that a judge to whom a case has been assigned "should not recuse himself on unsupported, irrational, or highly tenuous speculation; were he or she to do so, the price of maintaining the purity of appearance would be the power of litigants or third parties to exercise a negative veto over the assignment of judges." *Id.* This is precisely the situation which is presented by Bertoli. The application itself, if not frivolous, is highly tenuous speculation based upon self-serving conduct.

The First Circuit noted that initially there must be a charge of partiality supported by a factual basis. "Although public confidence may be as much shaken by publicized inferences of bias that are false as by those that are true, a judge considering whether to disqualify himself must ignore rumors, innuendos, and erroneous information published as fact in the newspapers." *Id.* at 695.

Secondly, the Circuit noted that:

disqualification is appropriate only if the facts provide what an *objective, knowledgeable member of the public* would find to be a *reasonable basis* for doubting the judge's impartiality. Were less required, a judge could abdicate in difficult cases at the mere sound of controversy or a litigant could avoid adverse decisions by alleging the slightest of factual bases for bias.

*Id.* (emphasis added) (citing H.R.Rep. No. 1453, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News, 6351, 6355 ("*House Report,* 1974 USCCAN at ——")).

The Court went on to note that:

Basic to our analysis is the undisputed conclusion that the judge did in fact have a close relationship with Governor Volpe. It is from this relationship the government infers two different causes for an appearance of partiality: it reasons that the judge's alliance to Volpe would appear to cause him to reward Kelly for handling the 1966 investigation in a manner favorable to Volpe, and that his allegiance to Volpe might make the public doubt his ability to respond impartially to the Masiellos when they appear as witnesses at Kelly's trial.

*Id.* at 696. The Circuit noted: "Even viewing all of the facts and inferences in a manner most favorable to the government, we cannot say that the only conclusion on this record as a matter of law is that the judge should have disqualified himself. Such ruling would go far to establish the precedent that any suspicion of partiality, though tenuous and remote in origin, would suffice to compel disqualification." *Id.* at 697.

The facts of *In re United States* were far more substantial than they are in this case. In point of fact, there is no foundation, other than Bertoli's conduct, which form the basis for this motion. *In re United States* concerns significant conduct of the trial judge in his history with the governor and the governor's family which formed the basis for an arguable, "reasonable" basis for doubting the judge's impartiality. That situation plainly is not present in Bertoli's Recusal Motion.

In *United States v. Greenough,* 782 F.2d 1556 (11th Cir.1986), a motion for recusal pursuant to section 455 was denied by the district judge and affirmed by the Circuit. The facts in *Greenough* arise out of a situation where it might be said it was the conduct of the judge which caused the 455 motion. Briefly, it appeared that the federal judge communicated with the state judge with regard to a conflict between the two as to which forum would try the defendant first. Thereafter, a story appeared in a local newspaper indicating that the state judge changed his mind and adjourned the trial after speaking with a very persuasive and very angry district judge.

The Circuit noted the district judge reviewed all the appropriate authorities and indicated that although he did speak with the state judge he unequivocally stated in his order there was no truth to the conclusory statements by a newspaper reporter that he was angry. Moreover, there was only a one-sentence comment in the article referring to the judge as very persuasive and very angry. The Circuit noted: "Under objective standards, there can be no reasonable inference of impartiality by the fact of the district judge, having a conversation with the state judge." *Id.* at 1559. The Circuit accepted at face value the unequivocal statement by the district judge denying the sentence in the news report attributing anger to him. *Greenough* quoted from *In re United States* that:

Although public confidence may be as much shaken by publicized inferences of bias that are false as by those that are true, a judge considering whether to disqualify himself must ignore rumors, in-

nuendos, and erroneous information published as fact in the newspapers. ... To find otherwise would allow an irresponsible, vindictive or self-interested press informant and/or an irresponsible, misinformed or careless reporter to control the choice of judge [sic].

*Greenough*, 782 F.2d at 1558 (citing *In re United States*, 666 F.2d at 695).

In *Sciarra*, the court noted, in connection with the appearance of District Judge Harold A. Ackerman on 60 Minutes and grant of interviews to various newspaper publications, that because standing was not appropriate a refusal to disqualify would not be disturbed. In that case, the Circuit observed that:

> Congress designated subsection (a) of the statute [§ 455] as a "general or catch-all provision" designed to enhance public confidence in the impartiality of the judicial system by requiring a federal judge *to disqualify himself* in any proceeding when "his impartiality might reasonably be questioned."

851 F.2d at 634 (quoting *House Report*, 1974 USCCAN at 6355).

> The Circuit went on to note that:

> Our court has interpreted subsection (a) to mean that "a judge should recuse himself where a reasonable man knowing all the circumstances would harbor doubts concerning the judge's impartiality."

*Id.* (citing *Dalfonso*, 707 F.2d at 760). The *Sciarra* court noted the legislative history for section 455(a) that:

> [T]his general standard is designed to promote public confidence in the impartiality of the judicial process by saying, in effect, if there is a *reasonable factual basis for doubting* the judge's impartiality, he should disqualify himself and let another judge preside *over the case.*

*Id.* at 635 (first emphasis supplied, second emphasis in original) (citing *House Report*, 1974 USCCAN at 6355).

In *Olander*, a defendant filed an affidavit seeking recusal for personal bias pursuant to Section 144. The affidavit noted the defendant

> had been involved in and had been a leader in public attempts to have Judge

Boldt impeached because of his "improper conduct" in *United States v. Washington*, that in these efforts [the defendant] appeared in newspapers and on T.V., that there had been wide publicity and news coverage about the petitions for impeachment, that he is confident that Judge Boldt must know about them, and that [the defendant] does not believe he can get a fair trial.

584 F.2d at 887. The Circuit found that recusal was not warranted and reasoned that the affidavit submitted by the defendant

> does not show the probability of the kind of personal prejudice of the Judge toward [the defendant] that would require disqualification. The affidavit does show that [the defendant], because he does not like the decision in *United States v. Washington*, has lost his objectivity toward Judge Boldt. It does not show a comparable loss of impartiality on Judge Boldt's part.

*Id.* at 888.

The *Olander* case is similar and dissimilar to the situation present. It is similar in the fact that Bertoli does not like the sentence imposed in the First Cannistraro Indictment upon his co-defendant and has lost his objectivity toward me. The facts do not show a comparable loss of impartiality on my part. It is dissimilar in that Bertoli's counsel has stated that the "recusal motion is not based on a claim that Judge Lechner is in fact biased against [Bertoli]." Bertoli Reply at 2.

In a similar vein, the First Circuit has noted when a party seeks recusal, that party must show not only that he has made an attack on the judge but that the actions of the judge evidence a personal prejudice against that party. *In re Union Leader Corp.*, 292 F.2d at 389. The court also stated:

> [A] judge's reasonable belief that a party was acting with a purpose of disqualifying him, his conclusion that such action was contemptuous and reprehensible, and even a very considerable showing of irritation, is in no way equivalent to personal bias and prejudice.

*Id.* at 390 (citations omitted). *See also Martorano,* 866 F.2d at 69.

Significantly, although it appears a reasonable person informed of all of the facts may well conclude the conduct of Bertoli was undertaken with the purpose of seeking my disqualification, I have not commented to the effect that the conduct of Bertoli is contemptuous and reprehensible, indeed I have not commented prior to this opinion with regard to the conduct of Bertoli and I have shown no irritation at all in connection with Bertoli's conduct.

> "Only a psychic pleader could allege that because a defendant has published uncomplimentary statements concerning a judge, the latter will be unable to give his critic a fair and impartial trial. If such a fantastic procedure were permitted, a defendant could get rid of a judge by the simple expedient of publishing a scurrilous article, *truthfully* alleging that the article was published, and clinching the matter by asserting the bald conclusion that, since the article was uncomplimentary, the judge must of necessity be prejudiced against the publisher."
>
> *United States v. Fujimoto,* [101 F.Supp. 293, 296 (D.Haw.1951)]. The mere fact that a defendant has made derogatory remarks about a judge is insufficient to convince a sane and reasonable mind that the attacked judge is biased or prejudiced, the standard used to test the sufficiency of an affidavit for recusal under section 144. [citations omitted] ... *To allow prior derogatory remarks about a judge to cause the latter's compulsory recusal would enable any defendant to cause the recusal of any judge merely by making disparaging statements about him. Such a bizarre result clearly is not contemplated in section 144.*
>
> *United States v. Garrison,* 340 F.Supp. 952, 957 (E.D.La.1972) (emphasis added).

The Third Circuit discussed in *Dalfonso* a denial of a motion for recusal. The case concerned a charge of distributing and conspiring to distribute narcotics. At a pretrial hearing the Government advised the court an informant notified the FBI that the prosecutor and one of the defense attorneys were going to fix the case. The judge acknowledged he was friendly with one of the defense attorneys but denied any attempt to fix the case. Although initially deciding to recuse himself, on reconsideration the judge decided not to effect recusal because of the undesireable precedent recusal would set in light of the basis for the motion for recusal.

In considering the recusal aspect of the appeal, the Circuit noted: "At the outset we observe that a federal trial judge's decision with respect to recusal may be reversed only for abuse of discretion." *Dalfonso,* 707 F.2d at 760.

The defendant pressed recusal pursuant to section 455(a). "The ... language [of section 455(a)] has been interpreted to mean that a judge should recuse himself where a reasonable [person] knowing all of the circumstances would harbor doubts concerning the judge's impartiality." *Id.* at 760. The court noted there were no reasonable grounds upon which a person familiar with the facts would question the impartiality of the trial judge. The court listed several reasons for this conclusion. Among these reasons, the court stated the following:

> [T]here is nothing in this record to warrant the fear that the judge has become so emotionally involved by the disclosures of possible efforts to corrupt that his ability to preside impartially might reasonably be questioned. On the contrary, it appears that defense counsel believed that the judge would be able to preside over the case in an impartial manner for they both readily assented to his decision to hear the case.

*Id.* at 760. As previously stated, at page two of his Reply, Bertoli states: "Defendant Bertoli's recusal motion is not based on the claim that Judge Lechner is in fact biased against him." Bertoli Reply Brief at 2. Clearly, "defense counsel believe[ ] that [I shall] be able to preside over the case in an impartial manner...." *Dalfonso,* 707 F.2d at 760.

The Circuit noted that "important considerations weigh against recusal." *Id.*

When the trial judge refused to recuse because of his concern that the recusal, under the circumstances, might set an undesireable precedent, he may have recognized the temptation that such a procedure offered to defendants ready to seize upon any opportunity to avoid trial before a particular judge.

*Id.* at 760–761.

The Circuit went on to note that potential judge shopping and the problem it caused "was not lost upon the framers of the federal recusal statute." *Id.* at 761. The House Report accompanying the Bill contained the following caution:

> Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice.

*Id.* (citing *House Report,* 1974 USCCAN at 6355) (emphasis in original). As noted: "A decision to recuse in the instant case might encourage false impugnment of the integrity of trial judges as a tactic in future cases." 707 F.2d at 761. Indeed, were the conduct of Bertoli to be accepted and tolerated, it might encourage false attempts as a tactic to disqualify trial judges in future cases.

In *Union Carbide Corp. v. U.S. Cutting Service, Inc.,* 782 F.2d 710 (7th Cir.1986), the court determined whether the district judge's refusal to recuse herself because of her husband's ownership of certain stock, during a period of time of the litigation, was an error under section 455(a) and (b). There was a class action against Union Carbide; the class included a number of corporations. It did not come out until a later time that some of the stock owned by the judge's husband (in an IRA) was in companies which would be members of the class. Accordingly, after the motion to recuse was filed, the district judge stepped out of the case and during this period of time her husband sold the stock, incurred a brokerage fee of $900 and put the proceeds in the mutual fund. The panel found that disqualification was not necessary.

Union Carbide argued that the judge might take it out against them for forcing the sale of the stock by the husband. "Union Carbide's argument is that by having to pay $900 in brokerage fees and giving up potential future appreciation in the value of the stocks, Judge Getzendanner might be sore at Union Carbide; or, at least, that a reasonable person might think she would be sore...." 782 F.2d at 715. The court went on to note: "Union Carbide has failed to present evidence that would enable the financial impact on Judge Getzendanner and her husband of the sale of the stock even to be evaluated." The Circuit rejected the arguments of Union Carbide as baseless.

> Remember that for these purposes the reasonable person is assumed to know all the publicity available facts bearing on the issue of recusal....

*Id.* at 716. In this regard, the court listed the amount of money made by the judge, the position of her husband in one of the largest law firms, the fact that $900 was less than one percent of the value of the stock and that there would be a fee incurred as soon as there was a decision to turn over the stock.

The significant aspect of *Union Carbide* is the stress on the rationale that a reasonable person is assumed to know all the publicly available facts. This is important with regard to the Bertoli matter, especially as the substance of the facts in *Union Carbide* compare to the substance of the facts concerning Bertoli. As mentioned, and as a reasonable person is assumed to know, the public facts in this case show the only basis for Bertoli's motion is his conduct. Additionally, Bertoli has a demonstrated history of attempting to rid himself of individuals or organizations who or which he considers a threat. See the Goldstein Lawsuit, the Grand Jury Lawsuit, the Lacey/Stern Letter, the Tracy Removal Demand and the Bertoli Recusal Motion.

The weight of authority is against compelling recusal merely by attacking a judge. *See United States v. Studley,* 783 F.2d 934, 939–940 (9th Cir.1986) (distributing leaflets against judge, filing suit against him not grounds for disqualification); *Dalfonso,* 707 F.2d at 761 (no recusal based on telephone call by anonymous informant accusing judge of corruption); *Olander,* 584 F.2d at 888 (attempt to have judge impeached no sufficient without more to support recusal); *United States v. Grismore,* 564 F.2d 929, 933 (10th Cir.1977) (threatened suits and scurrilous attacks not grounds for recusal), *cert. denied,* 435 U.S. 954, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978); *United States v. Wolfson,* 558 F.2d 59, 64 (2d Cir.1977) (defendant's threat to remove judge from bench and letter to New York Times accusing judge in "scheme to frame" defendant not grounds for recusal).[36]

In opposition to this considerable authority defendant relies primarily on *In re Olson,* 20 B.R. 206 (D.Neb.1982).[37] In that case, defendants accused the bankruptcy judge of conspiracy to set fees in a previous bankruptcy case. Nothing came of the accusations. Nonetheless, after the bankruptcy court denied the recusal motion, the district court on appeal reversed. That court stated:

The Court is not unsympathetic to the plight of Judge Crawford and other judges similarly situated who find their impartiality challenged not for anything they may or may not have done, but because a party is willing to make an accusation (supported or otherwise) to a government official. Stated somewhat differently, applied in this fashion, section 455 offers an all too convenient means for a party to choose a judge of his liking.

*Id.* at 211.

The weight of authority and the better reasoning counsel against the adoption of *Olson.*[38] The Third Circuit has noted the importance of guarding against the use of section 455(a) as a blank check for judge shopping.

An anonymous telephone call to the FBI or to the judge himself, or a telephone call to the prosecuting attorney by an imposter falsely claiming that an effort was being made to influence or even corrupt the trial judge, might open avenues for judge shopping by impelling the trial judge to recuse. We cannot reasonably call into question the impartiality of a presiding judge upon so tenuous a basis as a telephone call, made by a meddler or even an accused, suggesting that

---

**36.** Defendant cites *United States v. Cerrella,* 529 F.Supp. 1373 (S.D.Fla.1982) in contravention of this authority however that court in a section of the opinion entitled "Can a Party Achieve Recusal by His Own Conduct?" disavowed such a holding saying:

> *The circumstances of this case are unique:* a defendant persists in a plan to kill the sentencing judge, despite a grand jury investigation of his criminal scheme. He is apparently convinced he can "pull off" the murder with impunity despite the fact that law enforcement authorities will continually monitor his activities until he cannot operate illegally. The question of whether to permit a wrongdoer to achieve recusal by his own criminal acts *will not be addressed specifically* by the court.

*Id.* at 1380 (emphasis added).

**37.** Other cases cited by defendant present important factual differences, i.e., the absence of charges by defendant or the judge admitted bias. *See Potashnick v. Port City Constr. Co.,* 609 F.2d 1101, 1111 (5th Cir.1980), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980) (recusal required as judge and his father had

financial dealings with law firm); *United States v. Meyerson,* 677 F.Supp. 1309, 1315 (S.D.N.Y. 1988) (judge admitted actual resentment of attorney's tactics); *Marshall v. Georgia Pac. Corp.,* 484 F.Supp. 629, 637 (E.D.Ark.1980) (counsel's charges of racial bias created "displeasure" which "could have affected, at least subconsciously, the court's consideration of his client's cause of action.")

**38.** Bertoli also points to *Haas v. Pittsburgh Nat. Bank,* where the Third Circuit, under an abuse of discretion standard, upheld the district court's recusal because a number of newspaper articles, perhaps by litigants before the judge, had questioned his attitude to class actions and attorney's fee awards. However, the court specifically stated: "We do not hold that a district judge is required to recuse himself under these circumstances. Nor do we reach the question whether a judge may refuse to recuse himself solely because the appearance of unfairness has been created by the improper conduct of the parties or their counsel." 627 F.2d at 680.

the judge might succumb to improper inducements.

. . . . .

There is no reasonable basis in this record to question the judge's impartiality. A decision to recuse in the instant case might encourage false impugnment of the integrity of the trial judges as a tactic in future cases.

*Dalfonso*, 707 F.2d at 760–61 (footnote omitted).

In this case it very much appears Bertoli is attempting to use section 455(a) now and has in the past to avoid certain judges. Bertoli knew he was the subject of a criminal investigation. In June 1987, after the First Cannistraro Indictment, the Government filed a motion to stay discovery in the related civil case. In that case, an affidavit by Michael J. Cahill, Special Agent FBI, in support of that motion stated:

> [t]he other civil defendants in this action, Monarch, its principal owner, Leo Eisenberg, Richard O. Bertoli and Steven Cloyes, plus others, are primary subjects of the criminal investigation.

Cahill Aff., ¶ 4.

Instances of Bertoli's conduct concerning other judges, a United States Attorney, his office and a Grand Jury and its foreman are a matter of record. From January 1976 to the spring of 1977 a Federal Grand Jury investigated the demise of Bertoli's brokerage firm. Bertoli was aware of this investigation and corresponded with the U.S. Attorney's office about the matter. He threatened and in fact filed the Goldstein Lawsuit; he filed the Grand Jury Lawsuit. Bertoli demanded that "Judges Frederick Lacey and Lawrence [presumably Herbert] Stern be indicted." He also demanded the removal of Judge Tracy from the SEC hearing concerning Executive Securities.

Courts have taken a litigant's record on recusal into account when ruling on section 455(a) motions. *See, e.g., In re Martin–Trigona*, 573 F.Supp. at 1240. The importance of the appearance of impartiality of the federal judiciary is important but it "cannot be advanced so broadly as to permit either the government or a defendant under the guise of a motion to recuse to engage in judge-shopping." *United States v. Boffa*, 513 F.Supp. 505, 508 (D.Del.1981). *See also In re Martin–Trigona*, 573 F.Supp. at 1243. There are sound policy reasons for refusing to allow mere accusations against a judge require his recusal.

In *Studley*, the Ninth Circuit ruled that accusations the trial judge "knew that Internal Revenue Services (IRS) agents had perjured themselves, but did nothing" did not warrant recusal. 783 F.2d at 939. These accusations are similar to Bertoli's accusations that I failed to discipline the prosecutor in *Cannistraro*.[39] In *Studley* the court stated such allegations were "not extra judicial because they involve the judge's performance while presiding over her case." *Id.* The actions taken or not taken in the First Cannistraro Indictment are judicial in nature. An appearance of partiality cannot arise whenever a spectator expresses disagreement with the court's handling of an action.

Nothing in the record shows ill will on my part toward Bertoli, nor has anything been shown to demonstrate emotional involvement. Most significantly, the "important considerations" referred to by the *Dalfonso* court militate against recusal. 707 F.2d at 760. In the case *sub judice* there have been no allegations that anything I have done or said points to extra judicial prejudice toward Bertoli. The record discloses only actions by Bertoli. Any remarks made by him were made in a fit of pique years ago. A reasonable person knowing all the circumstances in this matter would not question my impartiality as to either Bertoli or Cannistraro. There is, therefore, neither reason nor basis to effect my recusal in this case.

*Conclusion*

Because neither Bertoli nor Cannistraro has shown the appearance of bias or prejudice, and for the foregoing reasons, the motions for recusal are denied. The

---

**39.** "Judge Lechner knowing the history of lies in the Cannistraro matter ... accepted these false statements...." Bertoli Amended Brief, Exhibit B at 3.